**Robert ROE, Plaintiff,**

v.

**The OFFICE OF ADULT PROBATION, et al., Defendants.**

**No. 3:96cv001 (DJS).**

United States District Court, D. Connecticut.

Aug. 27, 1996.

---

John P. Clifford, Jr., Eliot B. Gersten, Gersten & Clifford, Hartford, CT, for plaintiff.

Stephen J. O'Neill, Margaret Quilter Chapple, Attorney General's Office, Public Safety & Special Revenue, Hartford, CT, for defendants.

### *MEMORANDUM OPINION AND ORDER*

SQUATRITO, District Judge.

This cause is before the court on plaintiff's motion for preliminary injunction. An evidentiary hearing was held before the court on February 22–23, 26, 29 and March 5. Based upon the evidence adduced at the hearing, the record in this case, and the reasons set forth below, the court finds that the plaintiff has demonstrated that an injunction is warranted.

## I. FACTS

### A. The Plaintiff

Robert Roe was arrested in 1989 for sexual assault. In May, 1991, the plaintiff entered into a plea agreement in which he agreed to plead *nolo contendere* to six counts of sexual assault in the second degree in violation of Conn.Gen.Stat. § 53a–71 and six counts of risk of injury to a minor in violation of Conn. Gen.Stat. § 53–21. In August, 1991, the plaintiff was sentenced to twelve years imprisonment, execution suspended after six years, and a five-year term of probation. A newspaper article concerning the plaintiff's crimes and his sentence was published after the sentencing. Plaintiff remained incarcer-

ated until August, 1994, when he was released on parole. A violation of a condition of plaintiff's release led to a parole revocation proceeding in December, 1994, after which plaintiff was returned to prison for eight months in order to complete his original sentence.

Plaintiff was released from prison in August, 1995, and, pursuant to his sentence, was placed under the supervision of the Office of Adult Probation ("OAP"). Defendant Ronald Cormier is plaintiff's assigned probation officer.

## B. The Statute and the Guidelines

In 1994 the Connecticut General Assembly enacted a law regarding registration of persons convicted of sexual assault crimes. The law applied to individuals convicted of sexual assault, as that term is defined in the statute, "on or after January 1, 1995." Conn.Gen. Stat.Ann. § 54–102r.[1] The statute required these individuals to follow certain registration requirements and mandated law enforcement agencies to maintain the registrations "for one year after such person's sentence termination date," unless the person is convicted of a subsequent sexual assault charge after his release. Conn.Gen.Stat.Ann. § 54–102r(f). The registration information was to be kept confidential and disclosed only to law enforcement officers. Conn.Gen.Stat.Ann. § 54–102r(g).

In 1995 the Connecticut legislature amended § 54–102r to, *inter. alia,* provide for the release of information about a registered sexual offender to law enforcement agencies, governmental agencies conducting confidential background checks, or "to any specific person if such disclosure is deemed necessary by the chief of the police department or resident state trooper of the municipality to protect said person from any person subject to the registration requirement[ ]." Act of May 30, 1995, Public Act No. 95–142 § 10(g), 1995 Conn.Legis.Serv. 312, 317 (West). The class of persons to which the law applies, i.e.,

persons convicted of certain sex offenses on or after January 1, 1995, did not change.

Significantly for present purposes, Public Act 95–142 also mandates that the same class of offenders convicted "on or after the effective date of this act" who are serving a period of probation must "as a condition of such ... probation, immediately notify his ... probation officer ... whenever he changes his residence address." The probation officer then "shall notify the chief of police of the police department or resident state trooper for the municipality of the new address of the ... probationer and any other law enforcement official he deems appropriate." *Id.* § 6(b). The act goes on to declare that "[n]othing in this section or section 54–102r of the general statutes, as amended by section 10 of this act, shall be construed to prohibit a parole officer or probation officer acting in the performance of his duties and within the scope of his employment from disclosing any information concerning the parolee or probationer to any person whenever he deems such disclosure to be appropriate." *Id.* § 6(c).

Prior to 1995, the OAP had no policy or practice of notifying members of the general public of the criminal record of an offender under its supervision. Pursuant to § 6 of Public Act No. 95–142, the OAP promulgated a Sex Offender Notification Policy (the "Guidelines") which governed the manner in which "[i]nformation on convicted sex offenders will be provided to police, victims and other relevant individuals and organizations in order to enhance public safety and awareness." (Second Am.Compl., Ex. C at 1). The Guidelines represent "minimum requirements," and "Probation Officers may exceed these requirements when, in their professional judgment, it is necessary to prevent or reduce the risk of the sex offender reoffending. *Id.* The enumeration of offenses to which the Guidelines apply is identical to those cases listed in sections 6 and 10 of Public Act No. 95–142 in which the conviction occurred after January 1, 1995. The Guide-

---

**1.** The law covers the following offenses: Conn. Gen.Stat. § 53–21(2), as amended by § 1 of Public Act No. 95–142 (injury or risk of injury to children); 53a–70 (sexual assault in the first degree); 53a–70a (aggravated sexual assault in the

first degree); 53a–70b (sexual assault in a spousal or cohabitating relationship); 53a–71 (sexual assault in the second degree); 53a–72a (sexual assault in the third degree); and 53a–72b (sexual assault in the third degree with a firearm).

lines extend also to "[p]ersons convicted of similar offenses in other states" under the supervision of Connecticut's OAP as well as "[a]ny other person under supervision of the Office of Adult Probation and determined through clinical assessment to be a high risk sex offender." *Id.* The Guidelines do not define the term "high risk sex offender." Unlike the legislation, which is to be applied prospectively, the OAP decided to "go beyond the law" and apply its policy retroactively to all offenders within its jurisdiction, including those convicted prior to January 1, 1995. (Pl.'s Notice of Additional Exs., Ex. P.; Pl.'s Mem.Ex. H).

The Guidelines establish two levels of notification which purport to link the seriousness of the risk of an offender reoffending with the breadth of notification. The first level establishes that if an offender is within the OAP's definition of "applicable cases" the probation officer will provide information regarding the offender to victims, victims parents or guardians, police, the offender's immediate family members, other occupants of the offender's residence, and treatment providers, including those not providing sex offender treatment. The second level concerns notification of cases involving "pedophiles, predatory rapists and other extreme cases," classification of which is to be determined by clinical assessment. In such cases, the probation officer must, after consultation with a supervisor, provide notification to immediate neighbors, local schools, local day care providers, employers, officials of schools, training programs and other organizations in which the client participates and other groups determined to be "at risk" due to the client's activities or proximity.

Under Connecticut law the court is authorized to sentence certain individuals to

a period of probation upon conviction of any crime, other than a class A felony, if it is of the opinion that: (1) Present or extended institutional confinement of the defendant is not necessary for the protection of the public; (2) the defendant is in need of guidance, training or assistance which, in his case, can be effectively administered through probation supervision; and (3)

such disposition is not inconsistent with the ends of justice.

Conn.Gen.Stat.Ann. § 53a–29(a) (West 1994). The court has broad discretion in setting the conditions of the defendant's probation term. The General Assembly lists several conditions for the court's explicit consideration and vests the sentencing judge with authority to impose "any other conditions reasonably related to [the offender's] rehabilitation." Conn.Gen.Stat.Ann. § 53a–30 (West 1994 & Supp.1995).

A defendant sentenced to a period of probation is placed under the supervision of the OAP. *Id.* § 53a–29(c). The OAP is a statutorily created department within Connecticut's judicial department, Conn.Gen.Stat. § 54–103a, the director of which is charged with supervision of the State's probation officers and the maintenance of "an efficient probation service in the superior court." Conn.Gen.Stat.Ann. § 54–105(a) (West 1994 & Supp.1995). The duties of probation officers under Connecticut law are to "investigate all cases referred to them for investigation by the director or by the court. They shall furnish to each person released under their supervision a written statement of the conditions of probation and shall instruct him regarding the same. They shall keep informed of [the probationer's] conduct and condition and use all suitable methods to aid and encourage [the probationer] and to bring about improvement in [the probationer's] conduct and condition." Conn.Gen.Stat.Ann. § 54–108. Connecticut law also authorizes the OAP to require a probationer to comply "with any or all conditions which the court could have imposed under [53a–30(a) ] which are not inconsistent with any condition actually imposed by the court." Conn.Gen.Stat. Ann. § 53a–30(b) (West 1994 & Supp.1995).

## C. The Challenge

Plaintiff filed a Verified Complaint on January 2, 1996, along with an application for temporary relief pursuant to Fed.R.Civ.P. 65. The complaint alleges that, although the plaintiff has complied with each condition of his probation, Defendant Cormier, his probation officer, has informed the plaintiff that Cormier intends to notify plaintiff's employ-

er, neighbors and the general community of plaintiff's prior criminal record. This decision allegedly was made after an evaluation conducted by a William Hobson, who is a social service provider acting under contract to the State of Connecticut, in which Mr. Hobson declared that the plaintiff constituted a "high risk" of danger to minors. Cormier informed the plaintiff that he intended to disclose this information pursuant to Conn. Gen.Stat. § 54–102r, as amended.

Plaintiff, invoking 42 U.S.C. § 1983, contends that the application of this statute to him violates numerous constitutional rights. According to the plaintiff, the lack of notice and opportunity to be heard on the issue of his risk classification and consequent disclosure of his criminal history violates the Due Process Clause of the Fourteenth Amendment. Due Process is also violated by the lack of any provision allowing an individual to contest either the determination that disclosure is appropriate or the extent of disclosure. Plaintiff also contends that the application of the law to him violates the *Ex Post Facto* Clause; the Equal Protection Clause; and the Double Jeopardy Clause of the United States Constitution. He also asserts that the defendants' actions constitute a violation of his plea agreement with the State of Connecticut.

After a conference on the afternoon of January 2, the court denied the plaintiff's application for a restraining order without prejudice based on the parties' agreement that notification would not take place until such time as the OAP had an opportunity to review plaintiff's risk level. Unknown to the court or the parties in attendance at the conference, Mr. Cormier already had begun the process of notification, disseminating the OAP notification form to the parents of the victims of the plaintiff's crimes, the plaintiff's employer, and the manager of the plaintiff's apartment building.[2] The information pro-

vided included: (1) plaintiff's name and address; (2) details of the plaintiff's automobile; (3) plaintiff's date of birth, sex, race, height, weight, build, eye color, hair color, and skin color; (4) the offense for which the plaintiff plead guilty; (5) the sentence imposed; (6) plaintiff's probation period; and (7) the conditions of plaintiff's probation. (*See* Pl.'s Mem., filing 77, Ex. L).

On January 3, 1996, the plaintiff filed a second motion for a temporary restraining order, which the court granted after a conference with the parties. The court scheduled a hearing on plaintiff's motion for preliminary injunction for January 18, 1996. On consent of the parties, the hearing date subsequently was extended to February 22, 1996.[3]

## II. DISCUSSION

Increasingly, states are responding to the problem of recidivism in sexual offender cases by singling out those members of a community who have in the past committed such a crime in the hopes that such a practice will prevent that offender from reoffending. Although born in the context of registration laws, which afford law enforcement agencies a tool to track past sex offenders, the notion has been extended to include notification laws, which enable the government to inform the citizenry when a past sex offender is in the midst of a community.

The plaintiff in this case does not challenge the validity of the legislative judgment regarding the problem of recidivism, and for purposes of the pending proceeding that judgment is accepted. Acquiescence to the correlation between sex offender cases and relatively high recidivism rates, however, does not end the inquiry. Cases such as this one pit the interests of society to protect itself from future harm against an individual's opportunity to flourish in the absence of

---

2. Cormier mailed the information to the victims and the plaintiff's family on December 26, 1995. (Cormier Dep., filing 42, at 54–55). The information was facsimilied to plaintiff's employer and to the manager of plaintiff's apartment building at some point after Cormier learned that Roe had filed this action. (*Id.* at 58).

3. Plaintiff filed a third application for a temporary restraining order on February 14, 1996, in which he sought an order barring the defendants' attempt to modify the conditions of plaintiff's probation based on information obtained by the defendants through plaintiff's deposition. The court denied this application after a hearing on February 14.

government intrusion. The context in which the case arises—the State's supervision of a probationer—distinguishes it factually from other cases which have grappled with the constitutionality of community notification laws. Nevertheless, most of the constitutional concerns are identical.

Our system of criminal justice recognizes that, once one's debt to society is paid, the offender has compensated the state for his or her wrongdoing and has earned a place back in society. *See Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 372 (1995) (expressing "fundamental belief that criminals, convicted and punished, have paid their debt to society and are not to be punished further"). This principle, coupled with the presumption of innocence, gives rise to an expectation that the individual will not be subjected to sanction unless he or she is again convicted of a breach of our criminal law. Yet, belief in the payment-in-full principle is idealistic. The idea runs counter to our recognition that convicted felons constitutionally may be prohibited from engaging in many activities enjoyed by society at large, such as exercising the right to vote. Thus, the notion that the mark of transgression is erased by payment of one's debt, whatever the form, is dispelled by our treatment of convicted felons.

Initially the Complaint was brought against Ronald Marcotte, the police chief of the town in which the plaintiff currently resides. Subsequently the plaintiff discontinued suit against Chief Marcotte. Insofar as the plaintiff's current, second amended Complaint seeks to declare unconstitutional the provisions of § 54–102r, as amended, that authorize disclosure of certain information by chiefs of police or resident state troopers, there is no information in the record regarding the applicability of this statute to the plaintiff. While a plaintiff need not "await the consummation of threatened injury to obtain preventative relief," *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 664, 67 L.Ed. 1117 (1923), the law by its terms does not apply to the plaintiff, and there is no indication that it has been or will be applied to him. Accordingly, the remainder of this Opinion will be directed at the actions of the current defendants only. The court does not pass upon Conn.Gen.Stat. § 54–102r as amended by § 10 of Public Act No. 95–142 and expresses no opinion on its constitutional validity.

## A. The Standard

■ This court may grant a preliminary injunction only if the moving party demonstrates a risk of irreparable harm and either (1) a likelihood of success on the merits, or (2) the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships decidedly favoring the party seeking relief. *See, e.g., Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 967 (2d Cir.1995); *McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 37 (2d Cir.1988); *Johnson v. Kay,* 860 F.2d 529, 540 (2d Cir.1988); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). The second ground for interim relief, termed the "fair-ground-for-litigation" prong, "may not be considered 'where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme.'" *NAACP v. Town of East Haven,* 70 F.3d 219, 223 (2d Cir.1995) (quoting *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)).

■ A preliminary injunction is an extraordinary measure, and the burden on a party seeking such relief is substantial. As stated above, the moving party must first demonstrate "irreparable harm." Serious questions going to the merits, standing alone, do not justify injunctive relief. "There must also be a showing of irreparable harm, the absence of an adequate remedy at law, which is the *sine qua non* for the grant of such equitable relief." *Buffalo Forge Co. v. Ampco–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981). Where, as in this case, a movant alleges the deprivation of a constitutional right, the movant satisfies this predicate, *see Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir. 1992), subject to the additional requirement that the threatened harm must be "actual and imminent" and "not remote or speculative." *State of New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 755 (2d Cir. 1977).

■ Moreover, if "the grant of the [preliminary relief] will give the movant essentially all the relief he seeks, the injunction is often deemed mandatory rather than prohibitory, and a somewhat higher standard is applied, under which the movant must show a *substantial* likelihood of success on the merits, rather than merely a likelihood of success." *Johnson v. Kay*, 860 F.2d 529, 540 (2d Cir.1988); *see also Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985).

### B. The Law

■ Plaintiff's Complaint is brought under 42 U.S.C. § 1983, which provides a remedy against "any person" who deprives another of rights protection by the Constitution or laws of the United States under color of state law. The analysis of plaintiff's claims begins with the acknowledgment that "[s]ection 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979)). To state a claim under 42 U.S.C. § 1983, a complaint must allege that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the Constitution or laws of the United States. *Gomez v. Toledo*, 446 U.S. 635, 638, 640, 100 S.Ct. 1920, 1922–23, 1923–24, 64 L.Ed.2d 572 (1980); *Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2d Cir.1987). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271, 114 S.Ct. at 811. In this case, plaintiff's claims are based on alleged violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the *Ex Post Facto* Clause, and the Double Jeopardy Clause of the Fifth Amendment.[4] Because the court determines that retroactive application of the Guidelines of-

fends the *Ex Post Facto* Clause, it does not reach the other constitutional concerns raised by the plaintiff.

### C. Analysis

Plaintiff alleges that Public Act No. 95–142 is an unconstitutional *ex post facto* law as it has been applied to him through OAP's Guidelines. He alleges that the application of the law to him is *ex post facto* because the Guidelines operate retroactively in a manner that disadvantages the plaintiff. Moreover, Roe contends that the "broad discretionary public notification permitted by the Act constitutes punishment in that it subjects plaintiff to 'public stigma and ostracism that would affect both [his] personal and professional life.'" (Pl.'s Mem. at 23). The State responds by arguing that the Guidelines do not amount to a "law" within the meaning of the *Ex Post Facto* Clause and, even if they do, the notification provisions do not constitute punishment.

■ The Constitution prohibits the States from passing any "ex post facto Law." U.S. Const. art. I, § 10. "The prohibition against *ex post facto* laws embodies two principal concerns. First, it helps to prevent legislative abuses by curbing the 'enact[ment of] arbitrary or vindictive legislation.' Second, it helps 'to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.'" *United States v. Meeks*, 25 F.3d 1117, 1118–19 (2d Cir.1994) (alteration in original) (citations omitted).

To argue, as the State does here, that the Guidelines are not laws within the meaning of the *Ex Post Facto* Clause ignores the issue. If a State can delegate to an agency the ability to establish what are in effect *ex post facto* laws and thereby insulate the State action from constitutional scrutiny, the Clause itself would be rendered meaningless.[5] The State relies on *DiNapoli v.*

---

4. The initial Complaint alleged a violation of the Eighth Amendment's prohibition of cruel and unusual punishment. The plaintiff has not pursued this claim in the current, Second Amended Complaint, however, and the issue has not been briefed or otherwise asserted by the plaintiff in

litigating the instant motion. This claim, therefore, will not be considered by the court.

5. Judicial approval of such a practice would render a clear and paramount constitutional command "little more than good advice." *Furman v. Georgia*, 408 U.S. 238, 269, 92 S.Ct. 2726, 2741–

*Northeast Regional Parole Comm'n,* 764 F.2d 143 (2d Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985), for the proposition that the Guidelines are not "laws" for purposes of *ex post facto* analysis. That case, however, is inapposite. In *DiNapoli,* the Second Circuit recognized that mere "guideposts" which assist a federal agency in exercising discretion are not to be equated with law. Significantly, the court noted that " 'these guidelines [do not] have the characteristics of law. They are not fixed and rigid, but are flexible.' " *Id.* at 146 (quoting *Ruip v. United States,* 555 F.2d 1331, 1335 (6th Cir.1977)). The Guidelines at issue in this case, however, are rigid; they do not purport to focus discretion or otherwise serve merely to inform the user. They are commands and, as such, they represent the official policy of the State of Connecticut, even though they arguably subvert that policy in their retrospective application. *See Akins v. Snow,* 922 F.2d 1558, 1561 (11th Cir.) (holding regulations having "force and effect of law" are laws for *ex post facto* purposes), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1079 (1991).[6]

▆ Treating the Guidelines as laws for purposes of the *Ex Post Facto* Clause therefore is appropriate, but the exercise brings to light significant differences between the Connecticut General Assembly's intent and the actions of the OAP. The court assumes that, in passing the notification provisions of § 54–102r, as amended, the General Assembly knew of the potential constitutional implications of applying the law retroactively. Indeed, the retroactive application of any sanction implicates the *Ex Post Facto* Clause, which embodies a host of concerns considered so fundamental to the Framers that it was singled out explicitly as a direct restraint on the legislative autonomy of the States entering the newly formed Union.[7] Unlike other states, Connecticut decidedly voiced its will that the law was to be applied only prospectively. An *ex post facto* challenge to the law *per se,* therefore, would be meaningless. The defendants' unilateral decision to apply the Guidelines retroactively, however, has resurrected an issue already laid to rest by the Connecticut General Assembly.

▆ The range of the *Ex Post Facto* Clause was first explored by the Supreme Court in *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798), where the Court identified four categories of laws prohibited as *ex post facto.*[8] At issue in this case is the third *Calder* category, which prohibits "[e]very law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed." *Id.* at 390. The Court has held that the Clause "is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' " *California Dep't of Corrections v. Morales,* —— U.S. ——, ——, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995) (quoting *Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30

42, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring) (discussing Eighth Amendment).

**6.** Defendants concede that § 6(c) "does constitute legislative recognition and authorization for the OAP policies which prompted disclosure in the plaintiff's case." Defs.' Mem., filing 46, at 7.

**7.** Chief Justice Marshall wrote of this particular intrusion on State sovereignty in *Fletcher v. Peck,* 10 U.S. (6 Cranch.) 87, 137–38, 3 L.Ed. 162 (1810):

Whatever respect might have been felt for the state sovereignties, it is not to be disguised that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their

property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the states are obviously founded in this sentiment; and the constitution of the United States contains what may be deemed a bill of rights for the people of each state.

**8.** "1st. Every law that makes an action, done before the passing of the law; and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender." Calder,* 3 U.S. (3 Dall.) at 390.

(1990)). "With respect to retroactivity, '[t]he critical question is whether the law changes the legal consequences of acts completed before its effective date.'" *United States v. Meeks,* 25 F.3d 1117, 1119 (2d Cir.1994) (quoting *Weaver v. Graham,* 450 U.S. 24, 31, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981)).

Plaintiff here does not claim that the Guidelines alter the definition of his crimes, so to prevail on this issue he must show that the *nature of his punishment* has been increased by virtue of the notification provisions.[9] The parties seem to be in agreement that this issue of whether notification constitutes punishment is the threshold and defining inquiry. *See Trop v. Dulles,* 356 U.S. 86, 95–96, 78 S.Ct. 590, 595–96, 2 L.Ed.2d 630 (1958) (plurality) (*Ex Post Facto* Clause applies "only to statutes imposing penalties"). They differ in their estimation of how this inquiry should be resolved.

The State argues that a court's focus in reviewing a law challenged as *ex post facto* is limited to a view of the goal of the legislation as punitive or remedial and, if remedial, an examination of the linkage between the scheme and the remedial end. Assuming a tight linkage, incidental punitive aspects of a remedial law are overlooked. The State's argument is not without support.

In *Trop v. Dulles,* the Court observed:

> If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc.—it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.

356 U.S. at 96, 78 S.Ct. at 595–96 (citation and footnotes omitted). Faced with the possibility that a given statute may have both a penal and a nonpenal result, the Court directed inquiry to the "evident purpose" of the legislation:

> The point may be illustrated by the situation of an ordinary felon. A person who commits a bank robbery, for instance, loses

his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.

*Id.* at 96–97, 78 S.Ct. at 596 (footnotes omitted). Similarly, in *DeVeau v. Braisted,* the Court held:

> The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession.

363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960). In *DeVeau,* the issue before the Court was the validity of a law prohibiting organizations from collecting union dues in the Port of New York if any officer or agent of the organization was a convicted felon. The Court, through Justice Frankfurter, upheld the law in the face of an *ex-post-facto* attack, concluding:

> Duly mindful as we are of the promising record of rehabilitation by ex-felons, and of the emphasis on rehabilitation by modern penological efforts, it is not for this Court to substitute its judgment for that of Congress and the Legislatures of New York and New Jersey regarding the social surgery required by a situation as gangrenous as exposure of the New York waterfront had revealed.

363 U.S. at 158, 80 S.Ct. at 1154.

■ Were the analysis to stop at the purpose of the governmental regulation at

---

**9.** Contrary to plaintiff's understanding, the Court has soundly rejected any connection between the Clause and laws that merely "disadvantage" an individual. *Morales,* —— U.S. at —— n. 3, 115 S.Ct. at 1602 n. 3.

issue, the court would have serious doubts regarding the plaintiff's ability to prevail on the *ex-post-facto* issue. If one tenet is clear regarding the proper analytical framework for an *ex-post-facto* challenge, however, it is the principle that a subjective analysis on either side of the controversy is not appropriate. *United States v. Halper,* 490 U.S. 435, 447 n. 7, 109 S.Ct. 1892, 1901 n. 7, 104 L.Ed.2d 487 (1989) (noting that from the point of view of a defendant "even remedial sanctions carry the sting of punishment"); *Collins,* 497 U.S. at 46, 110 S.Ct. at 2721 ("Subtle *ex post facto* violations are no more permissible than overt ones."); *United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980) (holding Court looks past intent to "purpose or effect" of legislation); *United States v. Huss,* 7 F.3d 1444, 1447–48 (9th Cir.1993) ("legislature may not insulate itself from an *ex post facto* challenge simply by asserting that a statute's purpose is to regulate rather than punish prior conduct"). In the final analysis, the State's entire argument is merely one factor in the equation.

Courts that have invalidated community notification laws on *ex post facto* grounds have gone beyond the issue of legislative purpose and examined whether the character of the proposed State action amounts to punishment. To guide the analysis, courts have applied the factors delineated in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *See Doe v. Pataki,* 919 F.Supp. 691 (S.D.N.Y.1996); *Rowe v. Burton,* 884 F.Supp. 1372, 1378 (D.Alaska 1994). *But see Artway v. Attorney General,* 81 F.3d 1235 (3d Cir.1996) (rejecting *Mendoza–Martinez* factors in *ex post facto* challenge); *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 403–04 (1995) (same). In *Mendoza–Martinez,* the Court summarized then-existing tests used to determine whether a statute was "essentially penal in character" as inquiring into:

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether

the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. Absent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on *its* face.

*Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. at 567–68 (footnotes omitted). The Court concluded that the legislative history of the statute "compel[ed] a conclusion that the statute's primary function [was] to serve as an additional penalty for a special category of" offender. *Id.* at 169–70, 83 S.Ct. at 568.

The State takes issue with the applicability of the *Mendoza–Martinez* factors to Roe's *ex-post-facto* challenge in this case. Support for the State's argument is found in an opinion of the Court holding that "[i]n addressing the separate question whether punishment is being imposed, the Court has not employed the tests articulated in *Mendoza–Martinez* and *Ward.*" *Austin v. United States,* 509 U.S. 602, 610 n. 6, 113 S.Ct. 2801, 2806 n. 6, 125 L.Ed.2d 488 (1993). *Austin* was a civil forfeiture case in which the claimant argued that the Excessive Fines Clause of the Eighth Amendment restrained the government's ability to forfeit property involved in the commission of an underlying narcotics-trafficking offense. In determining whether the law at issue was remedial or punitive for purposes of the Eighth Amendment, the Court applied its holding in *Halper,* 490 U.S. at 448, 109 S.Ct. at 1901–02, that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." After examining the history of forfeiture, the Court concluded that the practice traditionally was understood as a form of punishment. The Court also noted that Congress viewed the provisions at issue as punishment. Given these factors, the Court rejected the argument that the forfeiture provisions at issue

served "solely a remedial purpose." *Austin,* 509 U.S. at 621, 113 S.Ct. at 2812. Under the logic of *Halper,* therefore, the forfeiture provisions constituted punishment and thus were subject to the Eighth Amendment.

The holdings of *Halper* and *Austin,* however do not support the approach advocated by the State in this case. Rather, in *Austin* for example, the Court explicitly held that-it "need not exclude the possibility that a [sanction] serves remedial purposes to conclude that it is" punishment. 509 U.S. at 610, 113 S.Ct. at 2806. Recognizing that a sanction can serve multiple purposes, the Court will hold punitive those sanctions that " 'can only be explained as also serving either retributive or deterrent purposes.' " *Id.* (quoting *Halper,* 490 U.S. at 448, 109 S.Ct. at 1902).

Courts addressing *ex post facto* challenges to community notification laws have wrestled with a universal definition of punishment that could then be applied across conceptual lines to different constitutional protections.[10] In reversing the district court in *Artway,* for example, the Third Circuit attempted a thoughtful synthesis of the Court's cases on the issue of what constitutes punishment. *Artway,* 81 F.3d at 1263. It is clear after *United States v. Ursery,* — U.S. —, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), that such a synthesis is not possible.

In *Ursery* the Court was faced with a challenge under the Double Jeopardy Clause of the Fifth Amendment to *in rem* forfeitures. Significant for current purposes, the Court cautioned that a "difference in approach was based in a significant difference between the purposes of our analysis under each constitutional provision." *Id.* at —, 116 S.Ct. at 2146. In rejecting the double jeopardy challenge, the Court ultimately applied a two-pronged test that looked first to legislative intent and second to "whether the proceedings are so punitive in fact as to 'persuade us that the forfeiture proceeding[s] may not legitimately be viewed as civil in nature,' despite Congress' intent." *Id.* at —, 116 S.Ct. at 2147 (quoting *United*

*States v. One Assortment of 89 Firearms,* 465 U.S. 354, 366 (1984)). In the end, however-er, the Court went on to analyze "[o]ther considerations that we have found relevant to the question whether a proceeding is criminal." *Id.* at —, 116 S.Ct. at 2149. These "other considerations" consist of: (1) an historical analysis of the sanction; (2) whether the government must show scienter as a prerequisite to the sanction; (3) whether the sanction serves a criminal goal; and (4) whether the sanction is tied to criminal activity. *Id.* at —, 116 S.Ct. at 2149. These factors bear a substantial similarity to those enumerated in *Mendoza–Martinez.*

■ Given the nature of community notification laws, which casts them in a form quite unlike any previous case, determining the dispositive issue of punishment can be done only through an approach that takes into account the unique quality of the individual's encounter with the machinery of the State. *Cf. Department of Revenue v. Kurth Ranch,* 511 U.S. 767, — – —, 114 S.Ct. 1937, 1946–47, 128 L.Ed.2d 767 (1994) (enumerating "unusual features" of state tax on possession of illegal narcotics that led to conclusion that tax was punishment for double jeopardy purposes); *see United States v. Stoller,* 78 F.3d 710, 717 (1st Cir.1996) (holding *Halper* "limited to cases involving fines, forfeitures, and other monetary penalties designed to make the sovereign whole for harm or loss that is quantifiable in actual or approximate monetary terms"). Because the *Mendoza–Martinez* analysis examines the nature of what the State is doing to the individual in determining whether a sanction is punitive or remedial, it is primarily this framework that should guide the court's inquiry.

■ For the reasons stated below, the court holds that the community notification provisions of the Guidelines constitute punishment, and that their retroactive application to Roe therefore offends the *Ex Post Facto* Clause of the United States Constitution.

---

10. *Mendoza–Martinez* itself involved not the *Ex Post Facto* Clause but the applicability of an individual's Fifth and Sixth Amendment rights to a proceeding divesting the individual of citizenship. The Third Circuit questioned the assumption "that 'punishment' for purposes of one constitutional protection is necessarily 'punishment' for another." *Artway,* 81 F.3d at 1258.

The first relevant inquiry involves whether the sanction imposes an affirmative disability or restraint on the individual. Like the courts that have previously considered this issue, this court concludes that the effect of community notification does amount to an affirmative disability. *See Pataki,* 919 F.Supp. at 701; *Rowe,* 884 F.Supp. at 1378. Here, unlike regulations restricting an individual's ability to engage in a certain activity or profession, the consequences of the governmental action are unlimited. Notification is an affirmative placement by the State of a form of public stigma on Roe, and this stigma by its very nature pervades into every aspect of an offender's life. Notifying persons with whom the defendant is involved in his daily life, such as his employer, his landlord and his neighbors, will impede his freedom of movement, thereby controlling his behavior. Notification moreover acts as the catalyst by which Roe's movements can and will be curtailed by the reaction of others. Indeed, testimony at the hearing established that the purpose of notification is to modify the behavior of both the offender and those with whom he comes into contact.[11] This factor indicates that the Guidelines are punitive.

Second, while the court is hesitant to resort to literary paradigms, it cannot be ignored that Judge Politan's examples in the district court's opinion in *Artway* do demonstrate that the practice of community notification is closely akin to what historically has been viewed as a form of punishment. *Artway v. Attorney General,* 876 F.Supp. 666, 689 (D.N.J.1995), *rev'd in part and aff'd in part,* 81 F.3d 1235 (3d Cir.1996); *see also Pataki,* 919 F.Supp. at 701. This factor, too, lends support to a view of the Guidelines as punishment.

The third factor, whether the governmental action is linked to a finding of scienter, points away from finding the Guidelines punitive. Although the governmental action is linked to the offender's culpability for his past unlawful conduct, the Guidelines are based on a finding of a propensity to offend in the future and not on a finding of scienter as that term is used in *Mendoza–Martinez. See Child Labor Tax Case,* 259 U.S. 20, 37, 42 S.Ct. 449, 450, 66 L.Ed. 817 (1922); *cf. Austin,* 509 U.S. at 617–21, 113 S.Ct. at 2810–11.

It is clear from the evidence presented at the hearing in this matter that the purpose of the community notification policy is deterrence, which is a traditional goal of punishment. *Pataki,* 919 F.Supp. at 701; *Rowe,* 884 F.Supp. at 1379. While this factor is by no means dispositive, *see Ursery,* —— U.S. at ——, 116 S.Ct. at 2149, the focus of the Guidelines on specific deterrence rather than general deterrence weighs in favor of a punitive sanction.

Moreover, as found by Judge Chin, community notification laws are by their nature intertwined with behavior that is already a crime. *Pataki,* 919 F.Supp. at 701; *see also Rowe,* 884 F.Supp. at 1379. We must not forget that the reason the Guidelines have been applied to the plaintiff is solely and exclusively his past criminal behavior. Consideration of this factor also leads to a finding of punishment.

The sixth and seventh factors identified by *Mendoza–Martinez* are interrelated. Together, they essentially constitute the State's argument in support of the Guidelines, i.e., there is a significant, non-punitive aspect of the policy and the implementation of this aspect is not excessive in relation to any incidental punitive effects. The court, however, does not agree with the State's conclusion.

There is no doubt that community notification is intended in part to protect the public from devastating crimes.[12] This goal certainly is one within the traditionally broad police powers of the State. The State, moreover, is insulated to some degree from any unpleasant consequences of notification by the fact that its affirmative acts are limited to the provision of information to the public. Yet

---

11. *See* note 12, *infra.*

12. At the hearing the State also presented evidence that community notification is linked to the treatment of sex offenders. While the imposition of so-called external controls on an offender may not be inconsistent with treatment goals, this does not alter the fact that it is a state-imposed sanction at issue in this case.

there can be no question that the State's interest in the plaintiff exists solely because of the particular nature of his past criminal conduct.

The punitive effects of community notification, however, are not merely incidental to an overriding non-punitive purpose. *Cf. United States v. Hernandez–Fundora,* 58 F.3d 802, 806 (2d Cir.) ("[T]he mere fact that a sanction ... has a punitive component does not mean that the sanction constitutes 'punishment' for double jeopardy purposes."), *cert. denied,* —— U.S. ——, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995). In fact, the linkage between community notification and the particularity of the conduct to which it applies lead to the conclusion that there is no way to distinguish the punitive from non-punitive effects. In the end, there is nothing to the State regulation other than the singling out of individuals based on their past crimes.

There is further reason to question the purported link between remedial goals (reduction of recidivism) and means (community notification) in this case. The Guidelines at issue here purport to establish two levels of notification. The first level turns on a clinical assessment concluding that the probationer is a "high risk sex offender." (Second Am.Compl.Ex. C, at 1). If such an assessment is made, notification is given to a certain class of individuals. To trigger the second level of notification one must, again through clinical assessment, be classified as a "pedophile, predatory rapist[ ] [or] other extreme case[ ]." *Id.* Mr. D'Amora, one of defendants' experts at the hearing, testified that there was no way for a clinician to classify an individual as an "extreme case[ ]" without some guidance regarding the underlying criteria. Mr. Santese, OAP's Deputy Director, resolved this seemingly impossible task by clarifying that a "high risk", case under the first tier of notification would also constitute an "extreme case" under the sec-

ond tier. Based on Mr. Santese's testimony, there essentially is no difference between the two levels of notification under the Guidelines. Thus, the characterization of the system by the State as one exhibiting a tight fit between means and ends does not withstand analysis.

■ The court is well aware that this case involves the State's management of its probation system. Probation itself is clearly a form of punishment, control over which has been recognized by the Court as a "special need" of the State warranting otherwise intolerable intrusions into areas protected by the Constitution. *See Griffin v. Wisconsin,* 483 U.S. 868, 875, 107 S.Ct. 3164, 3169, 97 L.Ed.2d 709 (1987).[13] In the prison-management context, the Second Circuit has remarked on the peculiar entanglement of punitive and remedial interests in any given State policy. *See Hernandez–Fundora,* 58 F.3d at 806. Nevertheless, the operation of a probation system does not grant the State a license to dispense with constitutional rights.

■ The concept of notice is fundamental to our system of justice. Albeit in a different context, the Court recently affirmed the importance of the role of notice in our constitutional law.

> Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose.

*BMW of North America v. Gore,* —— U.S. ——, ——, 116 S.Ct. 1589, 1598, 134 L.Ed.2d 809 (1996). It is precisely because the notification scheme at issue in this case is so inextricably interwoven with the criminal justice system that it warrants a searching inquiry under the *Ex Post Facto* Clause. When the plaintiff committed his crimes, and even when the plaintiff was sentenced,[14] the

13. *Griffin* arose in the Fourth Amendment context. Unlike the Fourth Amendment, the scope of the *Ex Post Facto* Clause is not defined in terms of reasonableness. The latter prohibition is absolute.

14. In terms of balancing equities, the breach of plea agreement argument certainly is the most

compelling from the perspective of an individual who is forced to succumb to a policy instituted by the State so long after a plea of guilty is entered. The court is of the opinion, however, that this issue cannot be heard in this forum in the first instance. Plaintiff presents this claim under the ambit of a breach of contract. He does not specify the relief requested in connec-

State of Connecticut had an arsenal of potential sanctions to which the plaintiff could be exposed. Community notification was not within that arsenal. It is only today, years after his offenses, that the plaintiff is subject to this sanction, and it is only after an Act passed by the Connecticut General Assembly made it a possibility.

## III. CONCLUSION

 For the reasons set forth above, and on the basis of the record before the court, the court is persuaded that the plaintiff has adequately alleged a risk of irreparable harm and that he has demonstrated a substantial likelihood of success on the merits of the *ex post facto* claim. Plaintiff's motion for a preliminary injunction (**document # 12**) therefore is **GRANTED,** and it is hereby

ORDERED that the defendants, their successors in office and all those acting in concert with them are hereby ENJOINED from applying the Sex Offender Notification Policy to the plaintiff, and it is

FURTHER ORDERED that this Order shall remain in full force and effect until further, express order of this court.

It is so ordered.

tion with the plea-agreement claim. If the relief contemplated is an injunction directing the Superior Court to allow the plaintiff to withdraw the plea, or ordering the conviction set aside, the appropriate relief would be obtainable only through the writ of habeas corpus. Viewing the claim in this manner, the relief would be foreclosed by plaintiff's failure to present this claim to the courts of the State of Connecticut. *See Heck v. Humphrey,* 512 U.S. 477, ——, 114 S.Ct. 2364, 2369, 129 L.Ed.2d 383 (1994); *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

Examining the claim as a species of plaintiff's due process cause of action, and thus capturing the potential for monetary relief for violation of the plea agreement, the procedural posture of this case would warrant a finding that the damage remedy, which tenuously secures plaintiff's jurisdictional grasp, precludes interim relief. *But see 1–95–CV–553–P1 v. 1–95–CV–553–D1,* 75 F.3d 135, 136 (2d Cir.1996) ("the only remedies available for breach of plea agreement are en-

forcement of the agreement or affording the defendant an opportunity to withdraw the plea"). In any event, the validity of such a due process claim is called into question by the Court's holding in *Humphrey, supra,* wherein the Court held that "to recover damages for allegedly unconstitutional conviction or imprisonment ... a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S at ——, 114 S.Ct. at 2372.

In sum, to the extent Roe advances this theory as an attack on the validity of his plea agreement with the State of Connecticut, his remedy in federal court is limited to a petition for a writ of habeas corpus, and in this case there is no indication that the plaintiff has presented his claim in a state forum. Viewed as a claim for damages arising from the breach, Roe's claim is altogether precluded.