**Robert ROE, Plaintiff–Appellee,**

**v.**

**OFFICE OF ADULT PROBATION; Robert Boscoe, Director of Office of Adult Probation; Ronald Cormier, Probation Officer; Michael Santese; and Donald Popillo, Defendants–Appellants.**

Nos. 1579, Docket 96–9157.

United States Court of Appeals, Second Circuit.

Argued March 25, 1997.

Decided Sept. 8, 1997.

Richard Blumenthal, Atty. Gen., Hartford, CT (Stephen J. O'Neill, Margaret Q. Chapple, Gregory T. D'Auria, Asst. Attys. Gen., Hartford, CT, on brief), for defendants-appellants.

Eliot B. Gersten, Hartford, CT (Aviva Cuyler, Gersten & Clifford, Hartford, CT, on the brief), for plaintiff-appellee.

(Frank W. Hunger, Asst. Atty. Gen., Washington, DC; Christopher F. Droney, U.S. Atty., New Haven, CT; Leonard Schaitman, Wendy M. Keats, Dept. of Justice, Washington, DC, submitted a brief for amicus curiae United States of America).

Before: NEWMAN, MINER and GODBOLD,* Circuit Judges.

JON O. NEWMAN Circuit Judge.

■ In *Doe v. Pataki*, 120 F.3d 1263 (2d Cir.1997), we upheld, as against a challenge under the Ex Post Facto Clause, the constitutionality of the registration and notification provisions of New York's version of "Megan's Law," which requires varying degrees of community notification about released sex offenders.[1] On this appeal we consider a similar challenge to a recently adopted notification policy of Connecticut's Office of Adult Probation ("OAP"). The specific issue is whether the OAP policy imposes "punishment" for purposes of the Ex Post Facto Clause, in which event it could not be applied to probationers who committed crimes before adoption of the policy. This issue arises on an appeal by the OAP and several of its officials from the August 27, 1996, order of the District Court for the District of Connecticut (Dominic J. Squatrito, Judge), preliminarily enjoining the defendants from applying the OAP's Sex Offender Notification Policy ("the Policy") to plaintiff Robert Roe, who was convicted of several sex crimes in 1991. *See Roe v. Office of Adult Probation*, 938 F.Supp. 1080 (D.Conn.1996). In light of our recent decision in *Doe v. Pataki, supra*,

we rule that notification pursuant to the Policy does not constitute punishment for purposes of ex post facto analysis. We therefore reverse the District Court's order and remand for further proceedings on Roe's remaining claims.

Background

Unlike most recent cases involving ex post facto challenges to community notification laws, the target of attack in this case is not a state statute, but an internal policy of a state agency. Nonetheless, because the OAP Policy is somewhat intertwined with, and perhaps partially authorized by, several recently enacted Connecticut statutes, we begin by examining the relevant legislation.

1. Connecticut's Registration and Notification Scheme

In response to similar concerns regarding the harm to society caused by sex crimes and the relatively high rate of recidivism among sex offenders, which have prompted the enactment of sex offender registration and notification statutes around the country, Connecticut has recently enacted its own version of "Megan's Law." The first step occurred in 1994, when the state legislature enacted a registration scheme for convicted sex offenders. *See* Act of June 9, 1994 ("1994 Act"), P.A. No. 94-246, 1994 Conn. Legis. Serv. 974 (West 1994). The 1994 Act applied only to individuals convicted after January 1, 1995, of "sexual assault," which includes the following seven offenses: aggravated sexual assault in the first degree, sexual assault in the first degree, sexual assault in the second degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, sexual assault in a spousal or cohabiting relationship, and injury or risk of injury to a minor. *See* Conn. Gen.Stat. Ann. § 54-102r(a)(1)(A), (b), (c).[2] The law re-

---

* The Honorable John C. Godbold of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. The New York statute is the Sex Offender Registration Act, N.Y. Correct. Law §§ 168–168v (McKinney Supp.1997). Statutes of this sort are called "Megan's Law," after Megan Kanka, the

seven-year-old victim of a sexual assault and murder in New Jersey in 1994, which sparked enactment of sex offender registration and notification statutes in that state and several others.

2. "Sexual assault" also includes "any crime committed in any other state or jurisdiction the essential elements of which are substantially the

quired these offenders to provide certain registration information to law enforcement officials, including name, address,[3] social security number, information about the crime of conviction, and a "complete description of the person including photograph and fingerprints." *Id.* § 54–102r(e). The 1994 Act, in addition to requiring registration, provided for minimal notification of information. Registration information could be disclosed only to "the custodian of such records or a sworn law enforcement officer, in the performance of his duties." P.A. No. 94–246, § 12(c).

In 1995, the Connecticut legislature amended section 54–102r to broaden notification significantly. *See* Act of May 30, 1995 ("1995 Act"), P.A. No. 95–142, 1995 Conn. Legis. Serv. 312 (West 1995). Section 10(g) of the 1995 Act appeared to permit (by exempting from a disclosure prohibition) the disclosure of registration information "to any specific person if such disclosure is deemed necessary by the chief of police of the police department or resident state trooper of the municipality to protect said person from any person subject to" registration. *Id.* § 10(g) (codified at Conn. Gen.Stat. Ann. § 54–102r(g)); *see also id.* (providing that any person disclosing registration information in violation of this section "shall be guilty of a class C misdemeanor"). Like the registration statute enacted in 1994, the 1995 Act, which became effective on October 1, 1995, applied only to persons convicted of "sexual assault" (as that term is defined in subsection 54–102r(a)(1) of the Connecticut General Statutes) on or after January 1, 1995. *See id.* § 10(a)-(c) (codified at Conn. Gen.Stat. Ann. § 54–102r(a)–(c)).[4] Thus, the 1995 Act had a limited retroactive effect—it applied to persons who committed sex crimes at any time *prior* to October 1, 1995 (the effective date of the 1995 Act), if they were convicted *after* January 1, 1995.

In 1997, after the District Court's decision in this case, the Connecticut legislature amended section 54–102r in two respects. *See* Act of June 26, 1997 ("the 1997 Act"), P.A. No. 97–183, 1997 Conn. Legis. Serv. 377 (West 1997). First, the 1997 Act deleted the January 1, 1995, date, which had limited the coverage of the registration requirements of section 54–102r(b), (c), thereby requiring registration regardless of the date of conviction. Second, the 1997 Act deleted the disclosure prohibition of section 54–102r(g), thereby arguably authorizing unlimited disclosure. This deletion also eliminated the provision of section 54–102r(g) making unauthorized disclosure a misdemeanor.

Especially relevant to the present dispute is the 1995 Act's provisions concerning the role and duty of probation officers. Section 6(b) provides that any sex offender sentenced to probation must "immediately notify his ... probation officer ... whenever he changes his residence address," *id.* § 6(b) (codified at Conn. Gen.Stat. Ann. § 54–102s(b)), and requires the probation officer so informed to "notify the chief of police of the police department or resident state trooper for the municipality of the new address of the ... probationer and any other law enforcement official he deems appropriate." *Id.* Section 6(c) of the 1995 Act then arguably authorizes broad disclosure by providing:

> *Nothing in this section or section 54–102r of the general statutes, as amended by section 10 of this act, shall be construed to prohibit a ... probation officer acting in the performance of his duties and within the scope of his employment from disclosing any information concerning the ... probationer to any person whenever he deems such disclosure to be appropriate.*

*Id.* § 6(c) (codified at Conn. Gen.Stat. Ann. § 54–102s(c)) (emphasis added).

---

same as any of the [seven] crimes" listed in subsection 54–102r(a)(1)(A). *Id.* § 54–102r(a)(1)(B).

**3.** A change of address must be reported if it occurs within ten years after the termination of a sentence or term of probation. Conn. Gen.Stat. Ann. § 54–102r(d).

**4.** Like the registration requirements, the notification provisions also applied to persons convicted of "any crime committed in any other state or jurisdiction the essential elements of which are substantially the same as any of the crimes" defined as "sexual assault" by subsection 54–102r(a)(1)(A). *Id.* § 10(a)(1)(B) (codified at Conn. Gen.Stat. Ann. § 54–102r(a)(1)(B)).

### 2. The OAP Policy

Prior to 1995, the OAP had no policy or practice of notifying the general public of the criminal record of a probationer under its supervision. In the fall of 1995, the OAP promulgated a policy on sex offender notification procedures. *See OAP Sex Offender Notification Policy* (1995) ("the Policy"). The application of the Policy to the plaintiff is the focus of the pending lawsuit.

The Policy became effective on October 1, 1995. *See* Memorandum from Michael E. Santese to Chief Probation Officers (Sept. 29, 1995). Its stated objective is "to enhance public safety and awareness." Policy at 1. Neither the coverage nor the operation of the Policy is entirely clear. In terms, the Policy applies to three categories of offenders under the supervision of the OAP: (1) persons convicted after January 1, 1995, of "sexual assault" (as defined by subsection 54–102r(a)(1)(A) of the Connecticut General Statutes), (2) persons convicted of "similar offenses in other states and transferred to Connecticut via the Interstate Compact," and (3) "[a]ny other person[ ] ... determined through clinical assessment to be a high risk sex offender," *id.*

The first category is explicitly limited to those convicted after January 1, 1995. Whether the second[5] and third categories were intended to be so limited is not clear. What is clear, and relevant to this case, is that the OAP has interpreted the third category to apply to probationers without regard to their dates of conviction. *See* Memorandum of Michael Santese to Robert Bosco[e], Nov. 20, 1995. Using that interpretation, the OAP has applied the third category to the plaintiff in this case, whose conviction occurred prior to January 1, 1995. Plaintiff does not dispute this interpretation of the Policy; indeed, it is that interpretation that creates his ex post facto challenge.

The Policy prescribes two levels of notification, purportedly correlated to the offender's risk of re-offense. The first level applies to all probationers meeting only the minimum criterion—conviction of a listed sex offense. Policy at 3. As to such probationers, the OAP will disseminate various information concerning the offender, including his name, address, physical description, crime of conviction, sentencing, and special conditions of probation. *Id.* The information will be disclosed to specified members of the community, including victims of the offender's crime, victims' parents or guardians, the police, the offender's immediate family members, other occupants of the offender's residence or apartment, and treatment providers.[6]

The second, more extensive type of notification applies only to sex offenders who are "[d]etermined by clinical assessment" to fall within the category of "pedophiles, predatory rapists and other extreme cases." *Id.* at 1. For such persons, the OAP will provide information regarding their identity, background, and address not only to the previously mentioned recipients, but also to the offender's immediate neighbors, local schools, local day care providers, the offender's employer, officials of organizations in which the offender participates, and "Other At Risk Groups due to [the offender's] activities and/or proximity ([*e.g.,*] Scouts; Senior Citizen groups)." *Id.*

This enhanced degree of notification for "extreme cases" applies to offenders, like plaintiff, who are in the third category of probationers, *i.e.,* those "determined through clinical assessment to be a high risk sex offender." *Id.*; Transcript of Hearing, Feb. 29, 1996, at 88–90 (testimony of Michael Santese) (stating that terms like "extreme case" and "high risk" all "basically mean the same thing"). Though there is some question whether the Policy, as written, was intended to apply its enhanced level of notification to "pedophiles, predatory rapists and

---

**5.** The reference in the Policy's second category to "similar offenses" appears to mean not only that the transferees committed the kinds of offenses listed for the first category but also that their convictions occurred after January 1, 1995. We do not decide the coverage of the second category, since it does not apply to the petitioner.

**6.** In addition to receiving general information concerning the offender's identity, whereabouts, and background, victims, victims' parents or guardians, and the police will also receive information concerning major status changes in the offender's life, such as a change of address or a change in the term or conditions of probation. *See* Conn. Gen.Stat. Ann. § 54–102r(a)(1)(A)–(B).

other extreme cases" convicted before January 1, 1995, the OAP has interpreted the Policy to make the enhanced level of notification applicable to such probationers and, pertinent to this case, to probationers like plaintiff who are in the "high risk" category, regardless of their dates of conviction. Memorandum from Michael Santese to probation officers, Dec. 26, 1995, at 1 ("Sex Offenders sentenced before 1/1/95 are also subject to notification, but only if they have been determined to be a pedophile, predatory rapist, or other extremely high risk case.").

The determination of "extreme case" or "high risk" must be made by a treatment provider after conducting a clinical assessment. Clinical assessments of probationers are conducted by mental health counsellors employed by The Connections, Inc., a private nonprofit corporation under contract to the OAP. Although neither the OAP nor The Connections has promulgated criteria by which to determine whether a probationer qualifies as a "high risk" offender or a "pedophile[ ], predatory rapist[,] or other extreme case[ ]," an employee of The Connections testified in the District Court that a sex offender's risk of re-offending is determined by ten to thirteen variables, including the offender's degree of denial, the number of prior offenses, the nature of the offenses, the number of victims, and the age of the victims. Transcript of Hearing, Feb. 29, 1996, at 3–4 (testimony of David D'Amora).

The OAP has not established any procedures through which a probationer can challenge or appeal an unfavorable clinical assessment or a decision by his probation officer to provide notification to persons perceived to be at risk from the offender. Moreover, the OAP considers its Policy "minimum requirements" that may be exceeded when individual probation officers determine, "in their professional judgment[,] [that] it is necessary to [do so] to prevent or reduce the risk of the sex offender re-offending." Policy at 3.

### 3. Prior Proceedings

Plaintiff Roe was convicted in 1991 of six counts of sexual assault in the second degree and six counts of risk of injury to a minor. He was sentenced to a term of imprisonment of twelve years, with execution suspended after six years, and a consecutive five-year term of probation. At least one article detailing Roe's offenses and conviction was published in a local newspaper at the time of sentencing. Roe remained incarcerated until August 1994, when he was released on parole. Approximately three or four months later, Roe's parole was revoked when he violated a condition of parole by inviting a boy under the age of sixteen to his home. Roe was thereafter returned to prison to complete his sentence.

Roe was released from prison in August 1995 and, pursuant to the probation component of his sentence, placed under the supervision of the OAP. Defendant Ronald Cormier is plaintiff's probation officer. The other defendants are also employees of the OAP: Robert Boscoe is the OAP's director, Michael Santese is the OAP's deputy director of operations, and Donald Popillo is Cormier's supervisor.

In November 1995, Cormier informed Roe that he was a candidate for notification pursuant to the newly adopted Policy and ordered him to meet with William Hobson, a mental health counsellor employed by The Connections. Although not a psychologist or psychiatrist, Hobson has extensive experience in the field of treatment of sexual offenders and has written several articles and book chapters in this area.[7] After conducting a one hour clinical interview with Roe, reviewing his probation records and parole board evaluation, and speaking with his regular therapist, Hobson concluded that Roe "poses a significant risk to reoffend." See Clinical Assessment of Roe, Dec. 20, 1995, at 3. Based on this determination, Cormier informed Roe that he would conduct community notification pursuant to the Guidelines because Roe qualified as a "high risk

---

**7.** Because of his expertise, the OAP had invited Hobson to participate in the drafting of its Policy.

sex offender" under the third category of persons subject to the Policy's operation.[8]

Roe filed the present suit in January 1996, claiming that the OAP's decision to notify the public of his identity, background, and whereabouts constitutes punishment in violation of the Ex Post Facto Clause, deprives him of due process, violates equal protection, puts him twice in jeopardy for the same offense, infringes upon his right to privacy, and violates his plea agreement. Although the District Court issued a temporary restraining order in early January, Cormier had already faxed information concerning Roe to his building manager and his employer by that time. According to Roe, he has been asked to leave his place of residence by his landlord and has been ostracized at his place of employment as a result of Cormier's notification. However, the District Court made no factual findings in this regard.

Although Roe requested the District Court to declare unconstitutional Connecticut's community notification *statute, see* Conn. Gen.Stat. Ann. §§ 54–102r, 54–102s (the 1994 Act as amended by the 1995 Act), the Court concluded that because Roe was not convicted of a listed offense on or after January 1, 1995, the "law by its terms does not apply to the plaintiff." [9] *Roe,* 938 F.Supp. at 1086. The Court therefore did not pass on the constitutional validity of any state law and focused its analysis exclusively on the OAP's Policy. Applying each of the seven considerations listed in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) to the facts of this case,[10] Judge Squatrito concluded that the community notification provisions of the Policy constitute punishment, and, therefore, that their application to Roe, who committed his crimes

prior to the adoption of the Policy, violates the Ex Post Facto Clause. The District Court did not reach Roe's remaining contentions.

## Discussion

On this appeal, the parties have tendered the sole issue of whether notification conducted pursuant to the Policy of the OAP "increase[s] the punishment for criminal acts," such that its application to Roe, who committed his offense prior to the Policy's issuance, would violate the ex post facto prohibition. *See Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 2720, 111 L.Ed.2d 30 (1990). Preliminarily, we have some doubts as to whether that constitutional issue requires decision in this case. Those doubts arise from unresolved issues of state law, based on two contentions of the defendants.

First, on this appeal, counsel for the defendants contend that the Policy was "prompted in part by the adoption of" the 1995 Act, and that "authority" for the Policy "is evidenced, in part, by the provisions" of the 1995 Act, quoted above, making clear that the 1995 Act does not prohibit disclosure by a probation officer "whenever he deems such disclosure to be appropriate." *See* Brief for Appellants at 6. To the extent that the Policy draws its authority from the 1995 Act, a state law issue arises as to whether the Policy applies to Roe, since that act applied only to those convicted after January 1, 1995. To whatever extent the Policy might be validated by the 1997 Act, this state law issue has been altered, and arguably removed, by the 1997 Act's elimination of the January 1, 1995, date limitation.

---

**8.** There is no indication that Cormier has decided to exceed the "minimum requirements" of the Policy.

**9.** Now that the 1997 Act has eliminated the January 1, 1995, date limitation, section 54–102r will apply to the plaintiff as of October 1, 1997, the effective date of the 1997 Act. *See* 1997 Act § 2.

**10.** The Supreme Court stated in *Mendoza–Martinez* that the following factors are "all relevant to the inquiry" of whether a statute is essentially penal or criminal in character:

Whether the sanction involves an affirmative disability or restraint, whether it has historical-

ly been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. . . .

*Id.* at 168–69, 83 S.Ct. at 567–68 (footnotes omitted).

Second, at the injunction hearing, the State took the position that the challenged notification was authorized by state law *prior* to issuance of the OAP's Policy. The OAP's deputy director for operations testified that Cormier was entitled, in the exercise of his (presumably statutory) authority as a probation officer, to make the notification of which plaintiff complains. *See* Transcript of February 29, 1996, Hearing at 94–95 (testimony of Michael Santese).[11] Counsel for the State defendants also contended that Cormier's notification was authorized without regard to the Policy. Arguing from caselaw that he asserted exposes a public officer to liability for a person's injuries when the officer knows of, but fails to advise a person of, a risk of such injuries, counsel said he did not "think anybody needs a statute authorizing them to warn somebody who is in danger."[12] Transcript of Feb. 29, 1996, hearing at 36. To the extent that the notification challenged by Roe is independent of the Policy as a matter of state law, no retroactivity issue arises.

■ These contentions frame state law issues as to whether state statutes, either the 1995 Act or the statutes governing probation officers generally, authorize promulgation of the Policy, and, even if not, whether notification is a valid implementation of state common law concerning the notification duties of public officers, without regard to the Policy.[13] Though resolution of these state law issues adverse to the defendants might render unnecessary a decision as to the ex post facto challenge to the Policy, we consider it appropriate to adjudicate the challenge for several reasons. First, the Policy, even if not essential as authority for the notification that oc-

curred, was relied on for such notification, and its constitutionality is sufficiently implicated to warrant decision. Second, the injunction on appeal was explicitly grounded on the ex post facto issue. Third, the issue is so clearly governed by our recent decision in *Doe v. Pataki, supra,* that resolving the issue requires no consideration of a new constitutional issue. We therefore proceed to the merits of the ex post facto issue.

We use the same two stage analysis we applied in *Doe v. Pataki,* 120 F.3d at 1274–75, as instructed by the Supreme Court, *see Kansas v. Hendricks,* — U.S. —, — —, 117 S.Ct. 2072, 2081–82, 138 L.Ed.2d 501 (1997); *United States v. Ursery,* — U.S. —, —, 116 S.Ct. 2135, 2147, 135 L.Ed.2d 549 (1996); *United States v. Certain Funds,* 96 F.3d 20, 26 (2d Cir.1996).

1. Intent

Turning first to the OAP's intent in adopting the Policy, we conclude that the OAP's primary intent in adopting its notification policy was to protect the public from potentially dangerous probationers under its supervision. As the text of the Guidelines states: "Information on convicted sex offenders will be provided to police, victims and other relevant individuals and organizations in order to enhance public safety and awareness." Policy at 1; *see also* Departmental Message from Don Popillo to Professional Staff, Dec. 1, 1995, at 2 ("[P]ersons determined to be high risk sex offenders should be subject to this notification process for the protection of the community."). Another stated purpose of the notification policy tracks a general statutory responsibility of

---

11. The Deputy Director testified, "The adoption of the policies has not changed the authority of probation officers to do this. What it has done is put it into a framework and make it a policy-driven process as opposed to one that was simply left up to the discretion of the probation officer." Transcript of Sept. 29, 1996, hearing at 94–95.

12. The Deputy Director of the OAP expressed a similar thought:

The [P]olicy does not rely upon [the 1995 Act]. It does not rely exclusively upon the law. The law, when it was passed, ... provided an impetus for us to develop a policy regarding notification.

. . . .
[The OAP] believes that [it] ha[s] the authority to provide information to members of the public when we think it is appropriate to do so, regarding persons under our supervision, specifically ... when [it] believe[s] [that notification] will enhance public safety.
Deposition of Michael Santese at 57–58.

13. We express no views on the merits of these state law issues, and leave them for future consideration, either in the District Court on remand, or, perhaps preferably, in the state courts in the event the District Court declines to exercise pendent jurisdiction over plaintiff's state law claims.

the OAP: to aid in the rehabilitation of probationers. *Cf.* Conn. Gen.Stat. Ann. §§ 54–105, 54–108. Under this theory, the awareness by the probationer's neighbors that he poses a potential danger serves as an external control potentially helpful in preventing a relapse. As deputy director Santese summarized, "The main goal [of public notification] is to get the individual successfully through the period of probation without reoffending and have long-term rehabilitative effects." [14] *Id.* at 64. Whether or not notification will be effective with respect to either public safety or rehabilitation, the OAP was entitled to promulgate policies that it believed would serve these ends.

We also conclude that the Policy's "objective manifestations," *Mendoza–Martinez,* 372 U.S. at 169, 83 S.Ct. at 568, indicate that it serves these stated regulatory ends. The Policy does not subject a probationer convicted prior to January 1, 1995, to any form of notification, even if he has committed one of the listed offenses, unless there has been an individualized clinical assessment by a treatment provider that the probationer either presents a "high risk" of re-offense or can be regarded as a "pedophile[ ], predatory rapist[,][or] other extreme case[ ]." This clinical assessment is conducted by an independent mental health counsellor, whose only objective is to determine whether the probationer presents a significant risk of recidivism. No notification will occur for probationers convicted of a listed offense prior to January 1, 1995, if they do not pose such a risk. In sum, whether notification occurs for those convicted before January 1, 1995, depends solely upon the offender's perceived risk of re-offense, and not upon the fact of his prior conviction. Moreover, the recipients of notification are limited to persons who may be endangered by the high-risk sex

offender, for instance other occupants of the offender's residence or apartment, immediate neighbors, local schools and day care centers, the offender's employer, and other groups at risk due to the offender's activities or proximity.

We conclude that the intent underlying the Policy was regulatory and that any burdens resulting from notification are incidental to those nonpunitive purposes. We therefore proceed to the second stage of the inquiry to determine whether the Policy is punitive in fact.

### 2. Punitiveness in Fact

■ The plaintiff bears the "heavy burden" of overcoming the regulatory or remedial purpose served by notification, *see Hendricks,* — U.S. ——, ——, 117 S.Ct. 2072, 2082, 138 L.Ed.2d 501, a burden that may be sustained only by the "clearest proof" that notification is "so punitive in form and effect" as to render it punitive despite the OAP's prospective, regulatory intent, *see Ursery,* — U.S. at ——, 116 S.Ct. at 2148. Several factors combine to indicate that the plaintiff's challenge to Policy cannot satisfy this rigorous standard.

■ First, as we ruled in *Doe v. Pataki,* the detrimental effects flowing from a statute will rarely be sufficient to transform an otherwise nonpunitive measure into punishment, especially when the challenged governmental action consists solely of the dissemination to selected members of the community of information, nearly all of which is publicly available. *See Doe v. Pataki,* 120 F.3d at 1276. Second, notification is not "tied" to criminal activity in any significant sense. Although a probationer's prior conviction for a listed sex offense is a necessary prerequisite for notifi-

---

**14.** Santese explained that the Policy was promulgated to serve these dual nonpunitive goals:

> There are several purposes [of the notification] polic[y]. Certainly one of the most important is public safety. It enables the recipients to have information that helps to protect them from becoming victims of sexual offenses.... [I]t also enhances the treatment process.... [Notification] helps to provide additional measures of—adds to the offender's self-restraints ... by virtue of the fact that knowing that others out there are aware of his circum-

stances ... would act as an inhibitor ... on [his desire to] engag[e] in any activities that might place [him] at risk of relapse or reoffending.

Transcript of Hearing, Feb. 29, 1996, at 63 (testimony of Michael Santese). Santese also testified that notification "enhances the [probation] supervision process by providing other resources ... of [ ] information [regarding the probationer's behavior] for the supervising probation officer." *Id.* at 64.

cation, it is not sufficient to trigger it. Rather, the earlier conviction is only one aspect of an aggregate assessment of the probationer's potential to re-offend. Third, the Policy is not excessive in relation to its purpose of enhancing public awareness and helping to prevent the recovering offender from harmful relapses. Only seven crimes can trigger notification, only persons determined to pose a high risk of re-offense are subject to notification, and only persons potentially endangered by the offender's proximity or activities will receive notification.

Fourth, there is no evidence that the Policy was intended to serve the goal of retribution, and the fact that it might deter probationers from committing sex crimes while on probation is not indicative of punitiveness. As the Supreme Court noted in *Ursery*, —— U.S. at ——, 116 S.Ct. at 2149, deterrence can serve both regulatory and punitive goals. Though making the public aware, through notification, of the offender's potential dangerousness might deter him from re-offending, this is done for the purpose of protecting at-risk populations and of ensuring that the offender does not stray from his rehabilitation. Fifth, as we discussed in *Doe v. Pataki*, 120 F.3d at 1284, community notification is not analogous to either traditional stigmatization penalties or banishment. Modern day community notification measures serve vastly different purposes than those served by these historical punishments, operate without the physical participation of the offender, and lack the general social significance accompanying traditional shaming and banishment penalties. In sum, Roe has not provided the "clearest proof" that notification pursuant to the Policy constitutes punishment in fact.

Moreover, one particular feature of the Policy is especially indicative of its nonpunitive character: the requirement, for application to those convicted before January 1, 1995, of an individualized clinical determination of an offender's high potential for re-offense. Unlike most community notification schemes in effect around the country, including the New York version upheld in *Doe v. Pataki*, the OAP's Policy incorporates the clinical assessment of a mental health coun-

sellor directly into the determination of whether notification will occur for each potential subject of notification. The decision to notify is not made by a sentencing judge or even by a board of experts applying criteria generally relevant to the assessment of likelihood to re-offend. Instead, the critical responsibility rests with an expert in the field of sex offender behavior and treatment, who must make a prospective determination after an individualized examination and assessment of the offender.

### Conclusion

As we noted in *Doe v. Pataki* with respect to Judge Chin's decision, we fully understand the conclusion reached in this case by Judge Squatrito and have carefully considered his thoughtful opinion. Nevertheless, in light of the constitutional standards as we believe they apply and particularly our recent precedent in *Doe v. Pataki*, we conclude that plaintiff's ex post facto challenge must be rejected. We therefore vacate the District Court's preliminary injunction and remand for further consideration, at least of plaintiff's remaining federal claims.