Defendant/Appellant, William Goode, was convicted on February 21, 1997, of two counts of rape and one count of disseminating matter harmful to juveniles. The charges were based on allegations by Goode's stepdaughter, Nicole, who claimed Goode had sexually abused her on numerous occasions beginning when she was approximately eight or nine years of age. Nicole also claimed Goode had exposed her to pornographic videos.
Goode was originally indicted on September 12, 1996, on three counts of rape and four counts of disseminating harmful matter to juveniles. Subsequently, on November 21, 1996, the State moved to amend the indictment, and Goode entered a plea of guilty to one count of gross sexual imposition and one count of disseminating harmful matter. The plea was entered pursuant to North Carolinav. Alford (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162, and the remaining counts were dismissed. However, Goode was later allowed to withdraw his guilty plea based on a claim of newly discovered evidence and the matter was then tried before a jury. Following Goode's conviction, the trial judge held a sex offender hearing on February 24, 1997, and found Goode to be a sexual predator. Goode was also sentenced to ten to twenty-five years on each rape, and to two years on the dissemination charge.
On appeal, Goode raises the following three assignments of error:
 I. The trial court erred when it subjected Appellant to proceedings under R.C. 2950 as the classification and notification requirements of that statute violate the ex-post facto clause of the United States Constitution and the retroactive clause prohibition of the Ohio Constitution when applied to Appellant.
 II. The trial court erred when it allowed additional jury deliberations after the jury foreman indicated in open court that the jury was hung on counts one and two of the indictment and the court agreed and determined that there was no probability of a verdict on said counts in violation of Appellant's due process rights as guaranteed under the United States and Ohio Constitutions.
 III. The trial court erred by denying Appellant's motion for acquittal pursuant to Criminal Rule 29 (A) when the State of Ohio failed to offer any proof that the alleged victim was an unmarried person which is an essential element of disseminating matter harmful to juveniles under R.C. 2907.01(I) and 2907.32(A).
 I
Effective January 1, 1997, Ohio instituted a new system of registration and notification for sexually oriented offenders, habitual sexual offenders, and sexual predators (Sexual Predator Act). Although Goode's alleged crimes occurred before January 1, 1997, Goode was included within the new system since his conviction, sentence, and adjudication as a sexual predator took place after the effective date of the Sexual Predator Act. In this context, R.C. 2950.01(G)(1) states that:
 An offender is "adjudicated as being a sexual predator" if any of the following applies:
* * *
 (2) Regardless of when the sexually oriented offense was committed, on or after the effective date of this section, the offender is sentenced for a sexually oriented offense, and the sentencing judge determines pursuant to division (B) of section 2950.09 of the Revised Code that the offender is a sexual predator.
A sexual predator is defined as "a person who has been convicted of or pleaded guilty to committing a sexually oriented offense and is likely to engage in the future in one or more sexually oriented offenses." R.C. 2950.01(E). Under the statute, sexually oriented offenses include twenty-two specifically listed offenses like rape, compelling prostitution, and pandering sexually oriented material involving a minor. See, R.C. 2950.01(D). While the vast majority of the listed offenses are felonies, some offenses are misdemeanors and some do not require sexual conduct as a predicate for conviction. For example, R.C. 2950.01(D)(2) includes various offenses involving victims under age eighteen, such as kidnaping, which is a felony, and unlawful restraint, which is a misdemeanor. However sexual contact is not necessarily a component of either kidnaping or unlawful restraint. See, R.C.2905.01 and R.C. 2905.03. Furthermore, besides the specifically listed offenses, R.C. 2950.01(D) embraces a broad range of offenses, including the following: violations of former Ohio laws that are equivalent to the twenty-two listed offenses; violations of existing or former laws of other states equivalent to the twenty-two listed offenses; sexually violent offenses; and attempts to commit any of the offenses listed in R.C. 2950.01(D). A sexually violent offense [as defined by R.C. 2971.01 and adopted by R.C. 2950.01(H)], is "a violent sex offense, or a designated homicide, assault, or kidnaping offense for which the offender also was convicted of or pleaded guilty to a sexual motivation specification."
In addition to sexual predators, the Sexual Predator Act applies to sexually oriented offenders, habitual sexual offenders, and sexually violent predators who are classified as sexual predators. A habitual sexual offender is "a person who is convicted of or pleads guilty to a sexually oriented offense and who has previously been convicted or pleaded guilty to one or more sexually oriented offenses." R.C. 2950.01(B). On the other hand, a sexually violent predator, as again defined in R.C.2971.01 and adopted by R.C. 2950.01(H), is a "person who has been convicted or pleaded guilty to committing on or after [January 1, 1997], a sexually violent offense and is likely to engage in the future in one or more sexually violent crimes."
Under R.C. 2905.04 and R.C. 2950.05, every individual convicted of a sexually oriented offense has a duty to register certain information, including current address and a photograph, with the sheriff of the county in which he or she resides, for a minimum of ten years. Sexual predators and habitual sexual offenders must provide additional information and must register for a longer period of time, i.e., for life and for twenty years, respectively. More frequent verification of a sexual predator's address is also required. Specifically, sexual predators are required to verify their addresses every ninety days, but other sexual offenders must only verify their addresses annually. R.C.2950.06(B)(1) and (2). Although registration information is not open to public inspection, no specific sanctions are provided for violations of confidentiality. In fact, R.C. 2950.12 grants immunity to various public officials and their agents, except for acts manifestly outside the scope of their responsibilities or done in bad faith. This immunity is from liability for civil actions to recover damages for injuries to persons or property arising from acts or omissions in connection with powers or duties under the Act, and would, therefore, extend to suits by persons affected adversely by improper release of information.
Other sections of the Act do provide for public notification. Under R.C. 2950.10, the victim of a sexually oriented offense is entitled to apply for and receive notice of the residence address of the offender, if the offender has been adjudicated as a sexual predator or a habitual sexual offender. Additionally, where an offender has been adjudicated a sexual predator, R.C. 2950.11
provides for community notification to the following groups: 1) occupants of residences adjacent to the offender's residence; 2) all additional neighbors within geographic areas designated by the attorney general; 3) various groups, such as the public children services agency, public schools, non-public schools, day care centers, and institutions of higher education located within a geographical area specified by the attorney general. Public notification is discretionary for habitual sexual offenders, but may be imposed if the sentencing court chooses to do so. Based on the statutory mandate, the attorney general has defined the "special geographic notification area" as the school district in which the sexual predator or habitual sexual offender resides. See, Ohio Adm. Code 109:5-2-01.
The notice to be given includes the offender's name, address, sexually oriented offense, and a statement that the individual has been adjudicated a sexual predator or a habitual sexual offender, whichever the case may be. R.C. 2950.11(B). However, the statute does not restrict, nor does it penalize further dissemination of information by any of the groups given notice. In fact, R.C.2950.11(E) indicates that the notice the sheriff must provide under R.C. 2950.11(A) and (C) is a public record open to inspection under R.C. 149.43.
Concerning the adjudication of sexual predator status itself, R.C. 2950.09 provides for automatic classification as a predator for offenses committed after the effective date of the Act, if the offender is convicted of or pleads guilty to a sexually violent offense and is also convicted of or pleads guilty to a sexually violent predator specification that was included in the indictment. For all other cases, persons who are convicted of or plead guilty to a sexually oriented offense may be classified as sexual predators only after a hearing. In the hearing, the court receives evidence relevant to whether the offender is a sexual predator and is to consider a variety of factors outlined in R.C.2950.09(B)(2). These factors include the offender's age; the offender's prior criminal record, including all offenses, whether sexually oriented or not; the victim's age; whether multiple victims were involved in the sexual offense; whether the offender used drugs or alcohol to impair the victim; the offender's prior treatment, if any, for sex offenses; any mental illness of the offender; the nature of the offender's sexual contact with the victim, including demonstrated patterns of abuse; whether the offender displayed cruelty; and a general catch-all category of "any additional behavioral characteristics that contribute to the offender's conduct." After evaluating the evidence, the judge then determines by "clear and convincing evidence" whether the offender is a sexual predator. As was previously noted, the trial court made such a conclusion in this case that William Goode is a sexual predator.
The constitutionality of Ohio's Sexual Predator Act is a matter of some debate among appellate courts in Ohio. For example, the Third District found in State v. Cook (Aug. 7, 1997), Allen App. No. 1-97-21, unreported, discretionary appeal allowed,80 Ohio St.3d 1470, that the Act violated the retroactivity provisions in Article I, section 28 of the Ohio Constitution. In contrast, the First, Ninth, Tenth, and Twelfth Districts have rejected both retroactivity and Ex Post Facto challenges. See, e.g., State v. Bartis (Dec. 9, 1997), Franklin App. No. 97AP05-600, unreported; State v. Lyttle (Dec. 22, 1997), Butler App. No. CA97-03-060, unreported; State v. Kimble (Feb. 4, 1998), Lorain App. No. 97CA006730, unreported; and State v. Lance (Feb. 13, 1998), Hamilton App. No. C-970301, unreported. In Lance, the court also rejected numerous other constitutional attacks on the Act, including due process, vagueness, equal protection, and double jeopardy challenges. However, in the present case, only issues pertaining to retroactivity and the federal Ex Post Facto Clause are before us. In reviewing this matter, we have carefully considered the decisions of our sister courts, as well as pertinent federal and state decisions that give guidance in these difficult constitutional areas. After consideration of all relevant matters, we join the majority of Ohio appellate courts in rejecting the challenge to the constitutionality of the Sexual Predator Act. To explain the basis for our decision, we will first address the retroactivity issue and will then discuss the federal Ex Post Facto Clause.
Our analysis begins with the issue of the scope of retroactivity under Article I, Section 28. Although some courts have used "ex post facto" and Section 28 retroactivity interchangeably, (see, e.g., Bartis, supra), we believe Section 28 of the Ohio Constitution is broader in scope than the federal Ex Post Facto Clause. The current version of Article I, Section 28 is derived from Article VIII of the 1802 Ohio Constitution, which was entitled "Bill of Rights." Section 16 of Article VIII stated that "[n]o ex post facto law, nor any law impairing the validity of contracts, shall ever be made." However, in the revised constitution adopted in 1851, the provision in the Bill of Rights was eliminated and the prohibition against ex post facto laws was changed to the current statement in Article I, Section 28, that "[t]he general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts." In VanFossen v. Babcock Wilcox (1988), 36 Ohio St. 100, 105, the Ohio Supreme Court commented that the new provision in the 1851 Constitution was "a much stronger prohibition than the more narrowly constructed" version in Ohio's Constitution of 1802. Likewise, the discussion in State ex rel. Matz v. Brown (1988),37 Ohio St.3d 279, implies that retroactivity under the Ohio Constitution and the federal Ex Post Facto clause involve different considerations. See also, State ex rel Corrigan v.Barnes (1982), 3 Ohio App.3d 40, 44; State v. Thrower (1989),62 Ohio App.3d 359, 369; Lyttle, supra, and Lance, supra (all concluding that Ohio's retroactivity clause is broader than the federal Ex Post Facto law). As a result, we conclude, as have other courts, that analysis of retroactive laws under Section 28 of the Ohio Constitution is different from consideration of expost facto laws under the federal constitution. As a result, we will treat the issues separately.
In Van Fossen, the Ohio Supreme Court said the legislature must first specify that a law is to be applied retroactively before courts can consider the constitutionality of the application. Once this threshold issue has been determined, courts can then evaluate whether the statute is substantive or remedial. If the statute is substantive, as that term has been defined, then it may not be applied retroactively.36 Ohio St.3d at 105-06.
Regarding the threshold inquiry, the retroactive intent of the legislature in enacting the Sexual Predator Act is obvious. For example, R.C. 2905.01(G)(1) and (3) extend the scope of sexual predator adjudications to situations where the conduct or conviction of the offender occurred before the effective date of the Sexual Predator Act. Additionally, R.C. 2950.02(B) reflects a clear retroactive purpose by stating that the law is intended to include habitual sex offenders who are about to be released from "imprisonment, a prison term, or other confinement."
Concerning the issue of whether the Sexual Predator Act is substantive or remedial, the test historically used is that a statute is labeled substantive when it:
 impairs or takes away vested rights, * * * affects an accrued substantive right, * * * imposes new or additional burdens, duties, obligations or liabilities as to a past transaction, * * * creates a new right out of an act which gave no right and imposed no obligation when it occurred, * * * creates a new right out of an act which gave no right and imposed no obligation when it occurred, * * * gives rise to or takes away the right to sue or defend actions at law.
* * *
 Remedial laws are those affecting only the remedy provided. * * * These include laws which merely substitute a new or more appropriate remedy for the enforcement of an existing right. * * * While we recognize the occasional substantive effect, it is yet generally true that laws which relate to procedures are ordinarily remedial in nature, * * * including rules of practice, courses of procedure and methods of review.
36 Ohio St.3d at 107-08 (citations omitted).
In the present case, Goode claims the new registration and notification provisions in the Sexual Predator Act are substantive because they impose new and additional burdens with regard to a past transaction. However, we disagree, based on the Ohio Supreme Court's discussion of this particular prong of the substantive rights test in Matz, supra. Specifically, the Matz Court said that "a later enactment will not burden or attach a new disability to a past transaction or consideration in the constitutional sense, unless the past transaction or consideration, if it did not create a vested right, created at least a reasonable expectation of finality." Id. at 281. Therefore, if Goode had either a vested right or a reasonable expectation of finality with regard to his criminal conviction, the registration and notification provisions in the Sexual Predator Act would impermissibly interfere with that right.
Unfortunately for Mr. Goode, the decision in Matz provides the answer to this question, via the Supreme Court's express observation that "past felonious conduct" is not a transaction that creates a reasonable expectation of finality. Id. at 282. Thus, the court noted that "felons have no reasonable right to expect that their conduct will never thereafter be made the subject of legislation." Id.
Regarding the particular factual context of Matz, the issue was whether a new disability attached to a past transaction when the legislature enacted R.C. 2743.60(E), which prohibited certain persons, including convicted felons, from being eligible for victims of crimes compensation awards. Like registration and notification, the inability to recover compensation is a negative consequence related to past conduct. However, as was noted, the Supreme Court found no vested right or expectation of finality rising to the level of a substantive right. After reviewingMatz, we see no logical basis for distinguishing that decision from the present case. Consequently, we believe we are compelled by Matz to find that William Goode had no reasonable expectation of finality with regard to his criminal conviction, and that he, therefore, had no substantive right, as consistently defined and interpreted by the courts of Ohio, in connection with the conviction. As a result, because the legislature could permissibly impose additional obligations based on Goode's conviction without infringing a substantive right, the Sexual Predator Act does not violate the prohibition in Article I, Section 28, against retroactive laws.
 II
As we mentioned earlier, Goode has also raised a challenge to the registration and notification provisions in the Sexual Predator Act, based on the federal Ex Post Facto Clause. In this context, Article I, Section 10 of the United States Constitution provides that "[n]o State shall * * * pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts." In Kansas v. Hendricks (1996), 521 U.S. ___, 117 S.Ct. 2072,138 L.Ed.2d 501, the United States Supreme Court analyzed the constitutionality of civil commitment under Kansas' Sexually Violent Predator Act by applying this test:
 We must initially ascertain whether the legislature meant the statute to establish "civil" proceedings. If so, we ordinarily defer to the legislature's stated intent. * * *
 Although we recognize that a "civil label is not always dispositive," * * * we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention to deem it "civil."
117 S.Ct. at 2081-82, 138 L.Ed.2d at 514-15 (citations omitted). The court in Hendricks did not outline exactly what should be considered in evaluating whether a statute is so punitive as to negate civil intent. However, a persuasive factor in the court's mind was the lack of evidence that the statute implicated retribution or deterrence, which are the two primary aims of punishment. 117 S.Ct. at 1082, 138 L.Ed.2d at 515.
Courts have disagreed as to the appropriate standard for deciding if a particular matter is "punishment" for purposes of the Ex Post Facto Clause. Some courts have applied a list of seven factors outlined in Kennedy v. Mendoza-Martinez (1963),372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644, while others have specifically rejected that approach or have used other tests, without commenting on the methodology. For example, in Lyttle, the Twelfth District used the test we quoted above, labeled the "intents/effects" test of Hendricks and United States v. Ursery
(1996), 518 U.S. ___, 116 S.Ct. 2135, 135 L.Ed.2d 549. Additionally, the Lyttle court referred to the Mendoza-Martinez
factors. See, Lyttle, slip op. at 19 and 21, n. 12. By contrast, in Bartis, the Tenth District simply relied on Hendricks andUrsery without consideration of the factors set forth inMendoza-Martinez.
Moreover, in Artway v. Attorney General of State of N.J. (3d Cir. 1996), 81 F.3d 1235, the Third Circuit Court of Appeals analyzed relevant Supreme Court authority and adopted the following three-part test requiring consideration of actual purpose, objective purpose, and effect. According to the court:
 [w]e must look at actual purpose to see "whether the legislative aim was to punish." * * *
 If the legislature's actual purpose does not appear to be to punish, we look next to its "objective" purpose. This prong, in turn, has three subparts. First, can the law be explained solely by a remedial purpose? * * * If not, it is "punishment." Second, even if some remedial purpose can fully explain the measure, does a historical analysis show that the measure has traditionally been regarded as punishment? * * * If so, and if the text or legislative history does not demonstrate that this measure is not punitive, it must be considered "punishment." Third, if the legislature did not intend a law to be retributive but did intend it to serve some measure of deterrent and salutary purposes, we must determine (1) whether historically the deterrent purpose of such a law is a necessary complement to its salutary operation and (2) whether the measure under consideration operates in its "usual" manner, consistent with its historically mixed purposes. * * *
 Finally, if the purpose tests are satisfied, we must then turn to the effects of the measure. If the negative repercussions — regardless of how they are justified — are great enough, the measure must be considered punishment. * * * This inquiry, guided by the facts of decided cases, is necessarily one "of degree."
Id. at 1263 (citations omitted). In adopting this test, the Third Circuit placed heavy reliance on United States v. Halper (1989),490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487, which had considered whether a civil fine levied after a criminal conviction was punishment in violation of the Double Jeopardy Clause. Id at 1254-56. According to the Third Circuit, Halper and other recent United States Supreme Court cases had changed "punishment" analysis to incorporate "an increasing focus on objective, effect-oriented aspects of the measure in question." 81 F.3d at 1262, n. 26. However, even after applying the three-part test outlined above, the Third Circuit upheld the registration provisions in New Jersey's law (known as "Megan's Law") constitutional.
In Artway, the Third Circuit also rejected use of theMendoza-Martinez test, citing an apparent United States Supreme Court admonition that Mendoza-Martinez is "inapplicable outside the context of determining whether a proceeding is sufficiently criminal in nature to warrant criminal protections of the Fifth
and Sixth Amendments." Id. at 1262. Previously, in Doe v. Poritz
(1995), 142 N.J. 1, 662 A.2d 367, the New Jersey Supreme Court had also concluded that the Mendoza-Martinez factors were inapplicable in ex post facto cases. Id. at 397-402 and 397, n. 14. UnlikeArtway, however, Doe v. Poritz used a different and less liberal analytical framework to evaluate punishment, stating that:
 [a]n initial inquiry is whether the legislative intent was regulatory or punitive: if the latter, that generally is the end of the inquiry, for punishment results; if the former, the inquiry changes to whether the impact, despite the legislative intent to regulate, is in fact, punitive, usually analyzed in terms of the accepted goals of punishment, retribution, and deterrence. Despite some ambivalent language, a punitive impact — one that effects retribution or accomplishes deterrence — renders the law or the specific provision of the law that is attacked, punishment, but only if the sole explanation for that impact is a punitive intent.
662 A.2d at 390. Based on this standard, the court found that the notification provisions in Megan's Law, with some court-imposed changes, were constitutional under the Ex Post Facto Clause.
Comparison of the two standards reveals a conflict, in that under Artway, effects can render a measure punitive, regardless of justification, so long as the negative repercussions are punitive. On the other hand, under Doe v. Poritz, punitive impact makes a law punishment only if the sole explanation for the impact is punitive intent.
After Artway, the United States Supreme Court decidedHendricks and Ursery. Both of these cases applied the "clearest proof" standard that we mentioned above. See, Hendricks,117 S.Ct. at 2082, 138 L.Ed.2d at 515, and Ursery, 116 S.Ct. at 2148,135 L.Ed.2d at 569. Subsequently, in E. B. v. Verniero (3d Cir. 1997), 119 F.3d 1077, the Third Circuit reaffirmed the validity of the Artway test, by confining Ursery to a civil forfeiture context. Additionally, the court found no inconsistency betweenHendricks and Artway in terms of the kinds of matters both courts actually considered. However, the Verniero court did attach some significance to the degree of deference given to the legislature by Hendricks, i.e., Hendricks' use of the "clearest proof" standard in the ex post facto context. Id. at 1096. According toVerniero, such a degree of deference had been previously given only where the issue was "`whether a proceeding is effectively criminal so that the procedural protections of the Fifth andSixth Amendments must apply.'" Id., citing Artway. Attempting to reconcile Artway with this greater degree of deference, the court said:
 Accordingly, in Artway terms, if we determine that the actual legislative purpose was remedial, we must sustain Megan's Law against the current challenges unless its objective purpose or its effect are sufficiently punitive to overcome a presumption favoring the legislative judgment.
119 F.3d at 1096. Finally, after applying the three branches of the Artway test, the Third Circuit found that the notification provisions in Megan's Law were not "punishment" for purposes of the Ex Post Facto and Double Jeopardy Clauses. Id. at 1105.
Unlike the Third Circuit, the Second Circuit Court of Appeals noted that although the United States Supreme Court had not precisely indicated the nature of the second prong inquiry into whether a measure is punitive in fact, the Supreme Court had approved the Mendoza-Martinez factors as helpful in analyzing the punitive nature of civil sanctions. See, Doe v. Pataki (2d Cir. 1997), 120 F.3d 1263, 1275 (upholding constitutionality of New York's Sex Offender Registration Act). As a result, the Second Circuit applied the factors to decide if the New York statute was punitive. Similarly, the same court upheld the constitutionality of the Connecticut Office of Adult Probation Sex Offender Notification Policy, again, using the Mendoza-Martinez factors.Roe v. Office of Adult Probation (3d Cir. 1997), 125 F.3d 47.
In our opinion, any conflict has been resolved by the recent United States Supreme Court decision in Hudson v. United States
(1997), 522 U.S. ___, 118 S.Ct. 488, 139 L.Ed.2d. 450. InHudson, the Court disavowed the method of analysis used in Halper
(1989), 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487, finding it "unworkable." 118 S.Ct. At 494, 139 L.Ed.2d at 460. The court's decision to reject Halper was motivated by the "wide variety of novel double jeopardy claims spawned in the wake of Halper."118 S.Ct. at 493 and 493, n. 4, 139 L.Ed.2d at 458 (citing, among others, the double jeopardy challenge to Megan's Law in Verniero).
Hudson involved a double jeopardy challenge to criminal indictments based on conduct for which the defendants had already been fined and occupationally debarred. In rejecting the challenge, the Court applied the two-part test used in Hendricks
and Ursery. Notably, the Court specifically approved the use of the Mendoza-Martinez factors in evaluating the second prong of the test, i.e., to consider "whether the statutory scheme was so punitive either in purpose or effect," * * * as to " transfor[m] what was clearly intended as a civil remedy into a criminal penalty." 118 S.Ct. at 493, 139 L.Ed.2d at 459. (citations omitted).
In view of Hudson's use of the Mendoza-Martinez factors outside the context of determining whether a proceeding is sufficiently criminal in nature to warrant criminal protections of the Fifth and Sixth Amendments, we conclude that Artway and Doe v.Poritz are no longer valid in their rejection of the use of these factors. Accordingly, based on the decisions in Hendricks,Ursery, and Hudson, the appropriate method is to first analyze legislative intent to decide if punishment was intended. Second, the statute is evaluated to see if it is punitive in fact, taking into consideration these factors from Mendoza-Martinez:
 (1) `whether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment — retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."
Hudson, 118 S.Ct. at 493, 139 L.Ed.2d at 459 (citation omitted). Again, only the "clearest proof" will prevail over legislative intent.
Regarding the first prong of the test, we note that the Ohio legislature's purpose in enacting the Sexual Predator Act was clearly remedial, not punitive. R.C. 2950.02 sets forth the legislative intent of the statute and emphatically expresses a purpose to protect the public, including children, by providing adequate information about sexual predators. Emphasis is placed on the fact that sexual predators and habitual sexual offenders have a high risk of engaging in further offenses. Also emphasized is the potential for public safety problems because of the lack of public knowledge about penal and mental health components of the justice system. R.C. 2950.02(A)(2) and (3). In short, the legislature has expressed concern for public safety, not an intent to punish sexual offenders.
Given the statute's remedial purpose, we then are required to consider the second prong of the test, including theMendoza-Martinez factors. As a preliminary matter, we note that registration has been almost uniformly upheld and we find no reason to deviate from that position, especially since the registration information under Ohio's statute is closed to the public, other than designated law enforcement personnel. See, Doev. Poritz, 662 A.2d at 387, and Russell v. Gregoire (9th Cir. 1997), 124 F.3d 1079, 1089. See also, R.C. 2950.08. Although some burden is placed on sex offenders, who must furnish their names, addresses, current employer, and other information to the police, the burden is not significant. Additionally, registration has not historically been considered punishment, State v. Pickens
(Iowa 1997), 558 N.W.2d 396, 400, and no scienter is required.
Concerning whether the legislation promotes traditional goals of punishment, we note that the primary goal of registration is to aid law enforcement personnel. This aim does not implicate retribution. Furthermore, while registration may have some deterrent effect, that is not the main purpose of requiring sex offenders to register. The sixth Mendoza-Martinez factor is whether alternative purposes of the statute may be rationally assigned. In this context, alternative purposes are evident, in that the statute is designed to aid law enforcement and to promote public safety. Finally, registration is not excessive in view of these alternate purposes. Pickens, 558 N.W. 2D at 400. See also,Doe v. Pataki, 120 F.3d at 1285, and State v. Noble (1992),171 Ariz. 171, 829 P.2d 1217, 1224 (both finding registration non-punitive). Therefore, like courts in other jurisdictions, and like the majority of courts in Ohio, we conclude that registration of sex offenders is not "punishment" for purposes of the federal Ex Post Facto Clause.
Regarding notification, we note that while public release of information carries the potential for negative effects, other courts have found that dissemination of information already available to the public is not sufficiently detrimental to turn an otherwise non-punitive measure into punishment. Roe,125 F.3d at 54; Doe v. Pataki, 120 F.3d at 1280; and Pickens, 558 N.W. 2D at 399. In Ohio, records of criminal conviction and orders of the Adult Parole Authority are open to the public. See, e.g., R.C.149.43(A)(1) and Ohio Adm. Code 5120:1-1-36. Since the public can obtain information about a sexual predator's conviction even in the absence of notification, the fact of disclosure of a sexually-oriented conviction is not a sufficient detriment to make the Act punitive.
A difference of opinion exists about the second factor, i.e., whether public notification would historically be considered punishment. Notification has been compared to the historical punishments of shaming and banishment. See, Artway,81 F.3d at 1265 (noting the "considerable force" of the defendant's comparison of historical shaming to notification), and Verniero,119 F.3d at 1115 (Becker, concurring in part and dissenting in part) (focusing on the fact that state-run dissemination of information is central to shaming punishments). Another opinion is that an appropriate analogy is to warnings of public hazards through means like wanted posters and quarantine notices.Verniero, 119 F.3d at 1100-01, and Russell, 124 F.3d at 1092. Still another opinion is that since the information is publicly available anyway and is not imposed in lieu of punishment, notification has no real analogy to historical shaming. Doe v.Pataki, 120 F.3d at 1283-84. As the court in Doe v. Pataki
commented:
 Stigmatization penalties of an earlier era primarily served distinctly punitive goals and operated through significantly different mechanisms than community notification * * *. First, such penalties were traditionally employed in small, homogeneous, and tightly knit social environments in which the "invisible whip of public opinion" upon the psyche of the offender * * * was often considered sufficient to served the traditional goals of the criminal law * * *. For many "victimless" moral or religious crimes, no other sanction apart from public humiliation was imposed by colonial communities.
Id. at 1283. By comparison, the court emphasized that notification under New York's sexual offender law was not imposed in lieu of fine or punishment, but occurred only after punishment had been served, for the purpose of community protection. Additionally, unlike shaming, notification did not require the offender to participate physically in his own degradation. Id. At 1284. Finally, the court observed that the historical analogy to banishment failed because the state did not act to remove an offender from a community. Instead, if retaliatory acts occurred, those were private actions not intended by the act. Id. The same reasoning was used in Russell, which found the shaming analogy insufficient to overcome the Washington Community Protection Act's non-punitive intent. Russell, 124 F.3d at 1091-92.
We agree with the analysis in Doe v. Pataki and Russell, and conclude that notification is not akin historically to shaming or the wearing of a "Scarlet Letter," as the defendant in our own case has suggested. Therefore, a historical analysis does not support a finding that notification is punishment. Of particular weight in our mind is the fact that the Ohio statute itself does not impose any negative consequences. To the contrary, such consequences stem from actions of the public and are not intended by the Act. Of additional note is the lack of evidence in the record before us of any harsh consequences attributable to community notification. Compare, Verniero, 119 F.3d at 1088-1090
(discussing the record before the lower court, which included affidavits about the experiences of nineteen sex offenders in New Jersey, information about registration and notification experiences of other jurisdictions, and a 1995 study done by the Oregon Department of Corrections on the impact of Oregon's community notification statute).
Factors three and five (scienter and whether the behavior to which notification is tied is already a crime),.do not weigh in favor of punishment, although the latter factor comes close to weighing in on the side of punishment. As was noted above, Ohio's Sexual Predator Act provides for classification of sexual offenders into three main groups: sexually oriented offenders, habitual sex offenders, and sexual predators. Only in the latter two categories does public notification apply, and even in those cases, dissemination of information about habitual sex offenders is discretionary, not mandatory. The classification of an individual as a sexual predator occurs only after a hearing, at which the offender is entitled to counsel and is allowed to present evidence, including expert testimony. R.C. 2950.09
(B)(1). A finding of scienter is also not required. Instead, the court is to weigh various factors, including the circumstances of the crime; the offender's mental illness, if any; treatment the offender may have received; and any other behavioral characteristics of the offender. While the statute does not require scienter, the issue of whether the behavior to which notification is tied is already a crime is much closer. In Doe v.Pataki, the court found the following persuasive to its decision that notification was not tied to criminal activity: 1) using a criminal conviction to trigger notification is a common ingredient of all such regulatory disabilities like the loss of the right to vote; and 2) while the sentencing judge has ultimate authority to decide an offender's risk level, the decision is not made at the time of sentencing but occurs later, just before the offender's scheduled release. Additionally, under the New York statute, the court acts only on the recommendation of a panel of experts on sex offenders, who have relied on "a guideline that focuses exclusively on whether the offender is likely to re-offend."120 F.3d at 1281.
Unlike the New York statute in Doe v. Pataki, Ohio's Act provides for the sex offender hearing to be held before sentencing, at a time when the offender has not had a chance for treatment. In cases like the present, where the individual is a first-time sex offender and has not yet received treatment, the court has no effective means of assessing whether the offender is, in fact, amenable to treatment. Also unlike New York, Ohio does not provide for a panel of experts who rely on guidelines focused on the tendency of an offender to re-offend. Therefore, this factor points to a finding that the statute is punitive. However, the punitive aspect is lessened considerably because R.C. 2950.09
(D)(1) allows sexual predators who have been imprisoned to petition the court not earlier than a year before their release for a determination that they are no longer sexual predators. As a result, treatment or rehabilitation could be considered before an individual returns to society and feels the impact of registration and notification.[1]
The next factor is whether the statute promotes traditional goals of punishment. In this regard, we see no evidence of retribution. Instead, the legislature clearly intended notification as a protective measure. Further, although notification may potentially deter future sex crimes, "deterrence can serve both regulatory and punitive goals." Roe,125 F.3d at 55, citing Ursery, 116 S.Ct. at 2149, 135 L.Ed.2d at 570. Again, because the legislature's primary purposes were to aid law enforcement and to protect the public, any deterrent aim was not overriding, nor could it be, in view of the high rate of recidivism and the generally poor prospects for successful treatment of sex offenders. See, Doe v. Poritz,662 A.2d at 374-75, and 374, n. 1.
Finally, the last two Mendoza-Martinez factors relate to whether a purpose other than punishment can be rationally assigned to the legislation, and if so, whether the measure is excessive with regard to the alternative purpose. The alternative purposes have been previously discussed in detail, and the issue is thus whether Ohio's notification system is excessive in light of those goals. In this context, we believe certain aspects of the Act might have been more effectively designed. For example, in other jurisdictions, the notification statutes place more reliance on the expert opinion of sexual predator experts than on a judge's decision. See, Doe v. Pataki, 120 F.3d 1263, 1268, and 1281 (five member board of experts develops guidelines and procedures for assessing risk of re-offense, and the court acts only on recommendations of the board.). See also, Roe, 125 F.3d 47, 55
(decision to notify is not made by sentencing judge or board of experts applying generally relevant criteria. Instead, the decision is made by an expert in the field based on individualized examination and assessment of an offender.) By contrast, the Ohio statute allows, but does not require expert aid in the inquiry. R.C. 2950.09(B)(1) The dangers inherent in this type of process are demonstrated by the present case, in which the trial court conducted a minimal hearing, did not consider testimony from experts on sexual predators, and relied on hearsay allegations from the previous jury trial, which had implied that Goode may have sexually abused another daughter. However, Goode did not object to the form of the hearing below, nor has he raised a challenge on appeal to the way in which the trial court applied Chapter 2905. Instead, Goode's sole challenge is to the retroactive and ex post facto nature of the law. Accordingly, we conclude that Goode has waived this argument. Schade v. CarnagieBody Co. (1982), 70 Ohio St.2d 207.
Although we have some reservation about how the law might be applied in particular cases, we do not find the provisions themselves excessive. The criteria to be used by the sentencing judge, for example, are quite similar to the factors used to gauge risk of re-offense in Doe v. Pataki, 120 F.3d at 1268, n. 6. Moreover, Ohio offenders not found to be sexual predators or habitual sex offenders are shielded from notification. Rather, their only duty is to register, and that information is not open to the public. In this regard, Ohio's notification provision is actually more restrictive than the New York law upheld in Doe v.Pataki, which allowed public access to information about low risk offenders, through a fee-based 900 number. Id. at 1269. Further, under the Ohio Act, even habitual sex offenders may avoid notification unless the sentencing judge finds they should be subjected to the notification requirements. R.C. 2950.09(E). Finally, regarding notification, the information released is confined to the offender's name, address, sexually-oriented offense, and designation as habitual sex offender or sexual predator. R.C. 2950.12(B).
Based on the contents of the Ohio statute, which limit dissemination and require findings to be supported by the heavy burden of "clear and convincing evidence, we conclude that the legislation is not excessive in relation to its goals.
After considering the Mendoza-Martinez factors as applied to Ohio's Sexual Predator Act, we find that they all weigh in favor of a non-punitive purpose and effect, with the exception that one factor is arguably punitive. However, we do not consider this factor sufficiently punitive to outweigh the other factors, particularly in light of the heavy burden that has been imposed by the United States Supreme Court. Accordingly, we conclude that the Sexual Predator Act is not punitive in fact. We also note that we would be hard-pressed to find a notification statute punitive when the Supreme Court has held in Hendricks that civil commitment of violent sexual predators is not punishment.
Based on the preceding discussion we find that Ohio's Sexual Predator Act does not violate the federal Ex Post Facto Clause. Given our conclusions on retroactivity and the ex post facto
issue, the first assignment of error is without merit and is overruled.
 III
In the second assignment of error, Goode claims the trial court violated his due process rights by allowing the jury to continue to deliberate after the jury indicated it could not reach a verdict. In this context, the record reveals that during jury deliberations, the jury sent a note to the judge stating that agreement had been reached on the charge of disseminating obscene matter to a juvenile, and also stating that the jury could not agree on the rape charges. The court then gave the jury a "modified Allen" charge. See, State v. Howard (1988), 42 Ohio St.3d 18, cert denied, (1989), 493 U.S. 873, 110 S.Ct. 203,107 L.Ed.2d 157. After giving essentially the same charge that had been approved in Howard, the trial court went on to ask the jury foreman if the jury could possibly reach agreement on the two rape charges after an additional period of deliberation. When the foreman answered in the negative, the court accepted the conclusion that the jury could not reach agreement on the rape charges. Consequently, the court told the jury to return to the jury room and to execute the form for the verdict the jurors had agreed upon.
After the jury returned to the jury room, a note was sent out to the trial judge indicating that the jury would like to look further at the facts. The jurors also said they had not been prepared to answer as a group when they were previously asked about reaching agreement. Upon receiving the note, the trial court decided to let the jury continue to deliberate. Ultimately, the jury returned guilty verdicts on all three charges.
After reviewing the record, we find nothing improper about the trial court's actions. "As a general proposition, the law certainly encourages jurors to agree rather than deadlock, and urging a jury to make every reasonable effort to reach a verdict is not improper." State v. Sabbah (1982), 13 Ohio App.3d 124, 138
(citations omitted). In the present case, the trial court initially gave an instruction approved by the Ohio Supreme Court and further said he would discharge the jury when it appeared that agreement could not be reached. However, without additional instruction or any pressure from the court, the jury changed its mind and wanted to explore the facts more closely. Also significant is the fact that the jurors said they were not prepared to answer as a group when questioned by the court. Under the circumstances, we see no impropriety and no reason to disturb the jury's verdict. Accordingly, the second assignment of error is overruled.
 IV
In the third assignment of error, Goode claims the trial court should have granted his motion for acquittal because the State failed to offer proof that the victim, Nicole Combs, was an unmarried person. In this regard, R.C. 2907.01 defines a juvenile as "an unmarried person under the age of eighteen." In State v.Karindas (May 18, 1992), Montgomery App. No. 12858, unreported, we recognized that for purposes of satisfying R.C. 2907.01, "the facts can "create inferences from which a jury could conclude beyond a reasonable doubt" that the person in question was unmarried. Goode acknowledges this holding, but asks us to reconsider Karindas and require the essential elements of the crime, including Nicole's status as a juvenile, to be proven by direct, rather than inferential evidence. We decline the invitation to elevate form over substance. Because the child in the present case was eight or nine years of age at the time of the incidents and was living with her mother and with Goode, who was her step-father, the only conclusion that could be reached is that she was unmarried.
Based on the preceding analysis, the third assignment of error is overruled.
Having overruled all three assignments of error, we affirm the judgment of the trial court.
YOUNG, P.J., concurs.
[1] On the other hand, R.C. 2950.09(D)(1)(a) prohibits sexual predators who are not imprisoned from filing a petition for reconsideration for one year following their judgment of conviction. While this provision would allow the effects of treatment to be evaluated, labeling individuals as sexual predators in this situation seems to make little sense. Presumably, individuals who receive probation rather than imprisonment for a sexual offense would be first-time offenders who appear amenable to treatment in lieu of imprisonment. By the same token, if such persons are dangerous enough to be labeled sexual predators, they would likely be imprisoned. As a result, we see a fundamental inconsistency between granting probation and labeling individuals "sexual predators." Certainly, if individuals are entitled to probation due to the lack of severity of their crimes or to other traditional factors warranting probation, they should likewise be free of the difficulties that registration and community notification might entail. However, this is not the situation before us, since Mr. Goode was sentenced to a substantial prison term.